STATE OF NEW YORK, Appellant, v ARNOLD WOLOWITZ, Doing Business as LA BONNE VIE ASSOCIATES, et al., Respondents.

ARNOLD WOLOWITZ, Doing Business as COUNTRY CLUB ASSOCIATES et al., Respondents, v STATE OF NEW YORK, Appellant.

Second Department, October 24, 1983

48

APPEARANCES OF COUNSEL

*Robert Abrams, Attorney-General (Melvyn R. Leventhal, Stephen Mindell, Herbert Israel* and *Andrew L. Levy* of counsel), for appellant.

*Wofsey, Certilman, Haft, Lebow & Balin (David I. Rosenberg* of counsel), for respondent.

OPINION OF THE COURT

GIBBONS, J.

Arnold Wolowitz, doing business as La Bonne Vie Associates, LBV Realty Associates, and Country Club Associates (hereinafter respondent) owns and operates two apartment complexes in Suffolk County known as the La Bonne Vie and La Bonne Vie II. The latter contains 635 apartment units and is located in East Patchogue; the former is in Coram and has 256 apartment units.

Respondent utilizes a form lease of 15 printed pages. He, through his attorney, acknowledges that the terms of the lease are not negotiable and that it is presented to a prospective tenant on a take-it-or-leave-it basis.

Acting in response to various complaints received from respondent's tenants, in or about January, 1979, the State Attorney-General commenced an investigation of various acts and practices of respondent, including an inquiry into the propriety of several of the provisions in the lease. The Attorney-General's office corresponded with respondent and his attorney, and vice versa, and, at one point, a conference was held. This informal communication failed to resolve the parties' differences.

During the pendency of the Attorney-General's investigation, by letter dated June 25, 1979, respondent notified tenants in La Bonne Vie II that, effective July 1, 1979, their rent would be increased 5% a month, the increase to remain in effect until the end of the lease term. Tenants in the La Bonne Vie apartments were informed of a flat $10 per month increase in rent. According to respondent, the rent surcharge was necessitated by rising heating oil costs which, in turn, were caused by the nationwide fuel crisis.

It is uncontroverted that there is no provision in the lease authorizing a fuel surcharge. In response to the June 25 letter, a petition of protest signed by 170 tenants from La Bonne Vie II was sent to respondent, with a copy to the Attorney-General's office. On June 28, 1979, a second letter was sent to the tenants by respondent, purportedly to clarify the first letter. According to the second letter, respondent was only "requesting a rental increase". The letter goes on to state that "[i]t was our original intention and continues to remain our intention to give each resident that pays the * * * energy increase a rider to their [sic] current lease which guarantees that new adjusted rent for the balance of its term. Furthermore, we will also waive the provisions of paragraph 32 in their [sic] lease with regard to any further increases due either to the fuel crisis or *any other* provision in this paragraph".

Paragraph 32 of the lease is entitled "Tax Clause" and provides for a rent surcharge in the event of an increase in property, water or sewer taxes, or in garbage collection costs. It does not contain a provision relating to heat or fuel.

Many tenants did pay the surcharge and executed a rider to their leases fixing a new monthly rental. The rider

included the following paragraph: "In consideration of the aforementioned increase the OWNER waives the provisions in paragraph #32 of the lease for any further rental increase and further agrees not to impose any further increase due to the fuel crisis. This provision will remain in effect for the full term of the captioned lease". This paragraph was not contained in new leases and renewed leases. Instead, a new paragraph 34 was added to the form lease, designated "Fuel Oil Clause", obligating the tenant to pay an additional $1 a month rent for every cent the cost to respondent of fuel oil exceeded 59 cents per gallon.

Apparently, the June 25 and June 28 letters, purporting to increase the rent, were not sent to new tenants or to tenants who had just renewed their leases. Tenants in these categories were, however, sent a letter, dated July 16, 1979, reading in pertinent part, as follows:

"The reason I had not written to you at that time was that you were either a new resident or had just renewed your lease. With the energy crisis accelerating and the cost of fuel oil continuing to increase at an alarming rate, I am forced to write to you requesting a rental increase due to the energy crisis.

"Since you are a new resident or one that has recently renewed their [sic] lease we are offering to you the option of either paying a 5% increase per month or signing a rider to your lease which would increase your rent in the future in direct relationship to any future increase in the cost of fuel oil.

"I would appreciate your contacting our office for further explanation or to discuss the alternative which best suit [sic] your needs. Regardless of which option you choose, you will receive a rider from us which guarantees no further rental increase either due to the fuel crisis or any other provision of your lease, including paragraph #32."

The Attorney-General's office circulated a form questionnaire to respondent's tenants, asking questions about, among other things, various portions of the lease and the fuel surcharge. About 250 filled-in questionnaires were returned to the Attorney-General.

On or about August 9, 1979, respondent commenced suit against "The State of New York, Department of Law,

Robert Abrams, Attorney General", seeking a declaration "that the lease is legal and proper under the Laws of the State of New York", and an injunction enjoining "defendant * * * from any interference with plaintiff in the conduct of his business concerning the lease and its provisions" and "from his conduct regarding an official investigation of the plaintiff and his business". Issue was joined with service of an answer, dated August 22, 1979.

By notice of motion, dated December 19, 1979, the Attorney-General moved to dismiss respondent's complaint for failure to state a cause of action and for failure to join necessary parties to the action, namely, the tenants. By notice of petition and petition, also dated December 19, 1979, the Attorney-General commenced a proceeding against respondent, in the name of the State of New York, for "an order enjoining respondent from engaging in conduct violative of Executive Law § 63 (12), directing restitution to eligible tenants and providing each tenant with a new lease in conformity with the Law". The petition contains 10 causes of action. The first alleges that the letters to the tenants, concerning the fuel surcharge, were "false and deceptive", and were "artfully contrived to convey the impression that the rent increase demanded was authorized by clause 32 of the lease". The second cause of action alleges that the lease's new paragraph, number 34, is unconscionable because, among other defects, it "provides for an arbitrary formula without regard to the amounts consumed that can result in a varying month-to-month charge". The remaining causes of action allege that various provisions of the lease are unconscionable and/or violative of statute. Specifically, and pertinent to this appeal, the Attorney-General questions the following provisions: (1) item 15 of the respondent's rules and regulations, appended to the lease, which provides that "[i]n the event the Resident requests service to the demised premises and such service call is found to be unwarranted, an 'unwarranted' service fee will be charged to the Resident"; (2) the portion of paragraph 3 of the lease which states that "a 4% late charge may be imposed on rents received after the 5th of the month"; (3) paragraph 31, which sets forth a schedule of attorney fees to be paid to respondent by a tenant in

any judicial proceeding commenced against the tenant; (4) paragraph 7, which provides that a tenant's security "will be placed in an interest bearing account and said interest, less 1% service charge, shall be paid to the Resident after expiration of the lease"; and (5) a rider to the lease requiring a tenant, if he wishes to keep a pet, to post "a damage bond" in the amount of one month's rent. In regard to keeping a pet, the Attorney-General alleges that, while not authorized in the rider, it is respondent's practice to require pet owners to pay $10 per month as additional rent.

Respondent moved to dismiss the petition on the grounds that his action against the State involved "the same relief" and "the same parties". In two orders, both dated March 3, 1980, Special Term (BRACKEN, J.), denied the Attorney-General's motion to dismiss respondent's complaint in the first action and denied respondent's motion to dismiss the petition brought by the State of New York. Thereafter, the Attorney-General moved to consolidate both matters. That motion was granted by Special Term (BAISLEY, J.), in the order and judgment being appealed from, dated June 1, 1981. In the same order and judgment Special Term disposed of both matters on the merits. In its memorandum decision, Special Term wrote, in relevant part: "motion #6,747, seeking consolidation of these two proceedings is granted. The pleadings under Index #80-456 [the proceeding under the Executive Law], raise issues, the determination of which has been regarded by the parties as dispositive of both actions, and will be so treated by the court".

Certain of the contentions of the Attorney-General, contained in the petition but not at issue here, were sustained by Special Term. However, all the above-described causes of action were dismissed, and Special Term declared that respondent's lease "is legal and binding", with the exception of certain provisions which are, again, not pertinent to this appeal. In its decision, the court explained its determination. In its view, respondent's action "with respect to obtaining a fuel surcharge * * * cannot be considered a repeated or persistent act within the meaning of [subdivision 12 of section 63 of the Executive Law]". Further, with respect to "¶3, late charges; ¶31, attorneys [sic] fees; ¶34, fuel surcharge; Rule 15 unwarranted service calls, and the

pet rider", "all attacked solely on the grounds of unconscionability", the Attorney-General "failed to meet his burden of proof". Finally, Special Term was of the opinion that the Attorney-General lacked standing to contest the rent security clause and that, in any case, that clause did not violate the law since, "[b]y accepting the lease, the tenants have voluntarily selected one of the options conferred upon them by General Obligations Law § 7-103 (2)".

I

As in his motion of December 19, 1979, on appeal the Attorney-General contends that respondent's complaint seeking declaratory relief and an injunction should be dismissed for failure to state a cause of action and because the court should not consider such an action in the absence of necessary parties, to wit, the tenants. Before reaching this claim, some procedural undergrowth should be cleared. Respondent points out that the Attorney-General did not raise these defenses in the answer to his complaint and that no appeal was taken from the order of Special Term (BRACKEN, J.), which denied the motion to dismiss the complaint.

It is, of course, true that certain grounds for dismissal of an action are waived if not asserted in the responsive pleading or in a motion to dismiss brought prior to the time service of the responsive pleading is required (see *Gager v White,* 53 NY2d 475). However, a motion for dismissal based on a lack of subject matter jurisdiction, failure to state a cause of action, or the absence of a person who should be a party, may be brought at any time even if such objection is not raised in the answer (CPLR 3211, subd [e]; Siegel, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C3211:58, pp 61-62). Therefore, the Attorney-General's motion to dismiss was not untimely.

The paper being appealed from, while labeled an order, is, in fact, an order and a final judgment. It determines the rights of the parties in both the action brought by respondent and the special proceeding initiated by the Attorney-General (CPLR 5011, 411, 3001) and "is dispositive of all factual and legal issues in the case [and], judicially settles the case between the parties" (*Matter of Slewett & Farber v Board of Assessors,* 80 AD2d 186, 200,

mod on other grounds 54 NY2d 547). Since the appeal is from a final judgment, it brings up for review "any non-final judgment or order which necessarily affects the final judgment" (CPLR 5501, subd [a], par 1). An order denying a motion to dismiss a complaint certainly affects the final judgment. It is clear that the propriety of respondent's action against the State of New York is properly before this court.

■ Respondent's suit against the State of New York is, in part, in the form of a declaratory judgment action, wherein the relief sought is a declaration that respondent's form lease is legal and proper. The tenants who are parties to agreements with respondent utilizing this form lease must be considered necessary parties to this action (CPLR 1001, subd [a]). "An action for a declaration of 'rights' and 'legal relations' * * * serves a legitimate purpose where all persons who are interested in or might be affected by the enforcement of such 'rights' and 'legal relations' and who might question in a court the existence and scope of such rights, are parties to the action and have opportunity to be heard. As to [such] persons who are not parties a declaratory judgment would be a mere academic pronouncement without juridical consequences, but which might be embarrassing if attempt is made thereafter to enforce these rights in legal proceedings to which they are parties. A court may, and *ordinarily must* [emphasis added], refuse to render a declaratory judgment in such case" (*Manhattan Stor. & Warehouse Co. v Movers & Warehousemen's Assn.*, 289 NY 82, 88; see, also, *Cadman Mem. Cong. Soc: v Kenyon*, 279 App Div 1015, affd 306 NY 151). In this case, the persons primarily interested in the "rights" and other "legal relations" under the form lease are respondent himself and his tenants. The interest in the lease held by the State of New York and the Attorney-General is, through the medium of subdivision 12 of section 63 of the Executive Law, only derivative of the interest possessed by the tenants (see *State of New York v Cortelle Corp.*, 38 NY2d 83, 86). A declaratory judgment, vis-à-vis the terms of the lease, would be binding on the State and the Attorney-General (CPLR 3001). However, the right of any tenant in a judicial proceeding to claim that some portion of the lease

was illegal would not be affected, since the tenant would not have had a full and fair opportunity to previously litigate the issue (*Schwartz v Public Administrator of County of Bronx,* 24 NY2d 65). Thus, a declaratory judgment would be virtually meaningless absent the participation of the tenants and, yet, could cause significant mischief by creating misconceptions among potentially interested parties. Accordingly, the action, insofar as it seeks declaratory relief, should have been dismissed (CPLR 3211, subd [a], par 10; see *Russell v City of New York,* 22 AD2d 706, affd 16 NY2d 641).

■ Respondent also seeks, in his action, injunctive relief against the Attorney-General, forbidding him "from any interference with plaintiff in the conduct of his business concerning the lease and its provisions" and from conducting "an official investigation of the plaintiff and his business". The request for an injunction, with respect to the Attorney-General's inquiry into the lease, is nothing more than an application for coercive relief in addition to but contingent on the sought after declaratory relief. As such, the form of the action is wrong. Since respondent is not seeking a ruling which would clearly affect other cases, nor is he seeking a remedy to a "continuing policy" of the Attorney-General, but only relief with respect to his own case, he should have brought an individual CPLR article 78 proceeding rather than an action for a declaratory judgment (see *Matter of Morgenthau v Erlbaum,* 59 NY2d 143, 152; *Allen v Blum,* 58 NY2d 954; *Matter of Zuckerman v Board of Educ.,* 44 NY2d 336, 343-344).

Respondent's request for injunctive relief suffers from an even more substantive and fatal malady than being brought in an improper form. "It is the settled policy of the courts not to review [by way of an action for an injunction] the exercise of discretion by public officials in the enforcement of State statutes, in the absence of a clear violation of some constitutional mandate" (*Gaynor v Rockefeller,* 15 NY2d 120, 131). The basis for the Attorney-General's investigation into the form lease and other business activities of respondent, and the proceeding eventually brought, is subdivision 12 of section 63 of the Executive Law. The statute provided, during the period in question, the following:

"Whenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business, the attorney general may apply, in the name of the people of the state of New York, to the supreme court of the state of New York, on notice of five days, for an order enjoining the continuance of such business activity or of any fraudulent or illegal acts, directing restitution and damages and, in an appropriate case, cancelling any certificate filed under and by virtue of the provisions of section four hundred forty of the former penal law or section one hundred thirty of the general business law, and the court may award the relief applied for or so much thereof as it may deem proper. The word 'fraud' or 'fraudulent' as used herein shall include any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions. The term 'persistent fraud' or 'illegality' as used herein shall include continuance or carrying on of any fraudulent or illegal act or conduct * * *

"In connection with any such proposed application, the attorney general is authorized to take proof and make a determination of the relevant facts and to issue subpoenas in accordance with the civil practice law and rules."

Respondent does not claim this statute is unconstitutional, nor could he, at least with any persuasiveness (see *Matter of State of New York v ITM, Inc.*, 52 Misc 2d 39, 52). Nor does he claim that the Attorney-General has attempted to enforce the statute in what would amount to an unconstitutional manner. All he alleges is that he has been and is being harassed by the activities of the Attorney-General. Such an accusation is patently insufficient to serve as a basis for an action seeking to enjoin the Attorney-General from attempting to enforce a mandate to him from the Legislature to protect the public from deceptive, misleading, fraudulent and otherwise illegal business practices.

As already noted, respondent's request for an injunction preventing further inquiry into the lease should have been brought as a proceeding pursuant to CPLR article 78.

Similarly, the application to forbid the Attorney-General from conducting "an official investigation of the plaintiff and his business", in essence, amounts to nothing more than a disguised writ of prohibition, which should have also been brought within a CPLR article 78 proceeding (CPLR 7801). When looked at from this perspective, there is additional reason to dismiss the suit against the State.

A writ of prohibition lies "only where there is a clear legal right and only when the body or officer 'acts or threatens to act without jurisdiction in a matter over which it has no power over the subject matter or where it exceeds its authorized powers in a proceeding over which it has jurisdiction' *** It must be directed to some inferior judicial tribunal or officer and lies to prevent or control judicial or quasi-judicial action only, as distinguished from legislative, executive or ministerial action" (*Matter of Dondi v Jones,* 40 NY2d 8, 13, quoting from *Matter of State of New York v King,* 36 NY2d 59, 62). So long as the Attorney-General's role in this matter was solely investigative, his role was "executive" in nature, and, therefore, no writ could lie (*Matter of McGinley v Hynes,* 51 NY2d 116, 124). Respondent's complaint, brought before the Attorney-General initiated the Executive Law proceeding, only addresses itself to the Attorney-General's investigative role and, as such, should have been dismissed. Furthermore, even if broadly construed as seeking a direction preventing the initiation of a proceeding under the Executive Law, wherein the Attorney-General's role might be considered quasi-judicial (see *Matter of McGinley v Hynes, supra,* p 123), it is obvious that respondent's complaint should have been dismissed since such a proceeding would be within the purview of the Attorney-General's "jurisdiction" under the Executive Law (cf. *Matter of Schumer v Holtzman,* 60 NY2d 46, 54). Respondent's remedy, in the face of such a proceeding, would be, and is, simply to defend on the merits and, if necessary, by way of appeal (cf. *Matter of Nigrone v Murtagh,* 36 NY2d 421).

For all the foregoing reasons, respondent's action against the State should have been dismissed. We now consider Special Term's disposition of the proceeding brought by the Attorney-General.

## II

For the sake of clarity, the following discussion concerning the proceeding brought under the Executive Law is divided into three parts. In part "A", we analyze the application of the pertinent statute (Executive Law, § 63, subd 12) to the fuel surcharge. Part "B" is devoted to the causes of action in the petition which question certain lease provisions on the grounds of unconscionability. Finally, in part "C", we examine the propriety, under statute, of the rent security clause which states that the interest on a tenant's security will be paid over to him or her on expiration of the lease.

## A

The statute under which the Attorney-General brought this proceeding requires a showing that the respondent being sued has engaged or is engaging "in repeated fraudulent or illegal acts or * * * persistent fraud or illegality in the carrying on, conducting or transaction of business" (Executive Law, § 63, subd 12). Special Term, citing *Matter of State of New York v Italian Line* (43 NY2d 851), held that respondent's "actions with respect to obtaining a fuel surcharge * * * cannot be considered a repeated or persistent act within the meaning of that statute". In *Italian Line (supra)*, a passenger shipping company, following the 1973 oil embargo, unilaterally imposed a fuel surcharge with respect to sailings after certain dates in early 1974, the surcharge being applicable both to future sales of tickets and sales already contracted for. This was done pursuant to provisions in the contract of passage, reserving to the shipping company the right to increase the fare. The Court of Appeals held that the surcharge "was not suspect of an unconscionable or illegal scheme", and that, in any case, there was no showing that the shipping company was engaged in an improper practice "on a repeated or persistent basis", the surcharge being imposed "only in connection with the extraordinary rise in the price of oil after the start of the 1973-1974 international oil embargo" (*Matter of State of New York v Italian Line, supra,* p 852).

Effective July 7, 1981, subdivision 12 of section 63 of the Executive Law was amended to include the following: "The term 'repeated' as used herein shall include repetition of

any separate and distinct fraudulent or illegal act, or conduct which affects more than one person" (L 1981, ch 476, § 1). A "Memorandum for the Governor" from the Attorney-General to former Governor Carey supporting the approval of the amendment reveals that it was designed to overcome the interpretation of the statute found in *Italian Line* (*supra*) and the interpretation made by Special Term in this very case.

The Attorney-General contends that the 1981 amendment should be applied retroactively so as to give him standing under the statute to proceed against respondent with respect to the fuel surcharge. He relies on various canons of statutory construction, characterizing the amendment as procedural and remedial. Respondent, on the other hand, argues that the amendment should have prospective application only. He maintains that the amendment "is more than procedural" and that a retroactive application of the amendment would be contrary to the legislative intent and unconstitutional. He, too, cites various canons of construction.

It has often been said that an appellate court must decide a matter before it on the basis of the law as it stands at the time of the appeal (see, e.g., *Matter of Slewett & Farber v Board of Assessors,* 80 AD2d 186, 196, mod on other grounds, 54 NY2d 547, *supra*). This maxim, while perhaps generally true, is not without exception. In the case of a change in decisional law, for example, where the change represents "a sharp break in the continuity of law", in some circumstances, a court may direct a prospective application only (*Gager v White,* 53 NY2d 475, 483-484, *supra;* see, also, *Gurnee v Aetna Life & Cas. Co.,* 55 NY2d 184). In the case of a change in statutory law, the question of whether there should be retroactive or prospective application can, at times, be quite complex.

Pidgeon-holding a statute into a category such as remedial, nonremedial, procedural or substantive cannot be relied on as a talismanic substitute for a careful analysis, which is often necessary, to determine whether a statute should be applied retroactively or not. Rather, the issue is generally a question of legislative intent, subject to constitutional limitations, and where that intent is not discerni-

ble, the court must look to the underlying purpose of the statute and attempt to effectuate it, taking into account the practicalities and realities of the situation (*Becker v Huss Co.,* 43 NY2d 527, 540-541; *Longines — Wittnauer Watch Co. v Barnes & Reinecke,* 15 NY2d 443, 453).

The Legislature's direction that the amendment "shall take effect immediately" (L 1981, ch 476, § 2) is equivocal with respect to the issue of retroactive or prospective application (*Becker v Huss Co., supra,* p 541). Likewise, the parties have been unable to point to anything in the legislative history which reveals the Legislature's intent in this regard. It has been stated that the statute itself "did not 'make' unlawful the alleged fraudulent practices, but only provided standing in the Attorney-General to seek redress and additional remedies for recognized wrongs which pre-existed the [statute]" (*State of New York v Cortelle Corp.,* 38 NY2d 83, 85, *supra*). The Attorney-General is given the power as it were, to stand in the shoes of those actually wronged, in this case, allegedly, the tenants. The statute does not impose on landlords or other businessmen any new obligation. Rather, its purpose is to open the door to a new means of vindicating obligations already existing. The 1981 amendment to the statute fulfills a similar purpose, allowing the Attorney-General to bring a proceeding when the respondent was guilty of only one act of alleged misconduct, providing it affected more than one person.

■ We need not resolve how the statute should be applied, given its purpose, to suits instituted after the amendment's effective date but based on events which occurred prior to that date, since that is not the posture of this case. It would appear, however, that, in such a situation, the Attorney-General would have a substantial argument in favor of the amendment's application (cf. *Matter of People v Parker,* 38 NY2d 743; *Longines — Wittnauer Watch Co. v Barnes & Reinecke, supra*). This proceeding is before us, having been instituted prior to the effective date of the amendment. Despite the salutary purpose of the amendment and its remedial nature, it would be inappropriate to apply it to a case, such as this, where the effect would be to nullify that which has already been done

(*Matter of Berkovitz v Arbib & Houlberg,* 230 NY 261, 270-271 [CARDOZO, J.]). If the amendment were only relevant to "future steps and stages" of the litigation, it might be applicable (*Matter of Berkovitz v Arbib & Houlberg, supra,* p 270). However, here the direct effect of the amendment's application would be the reversal of a portion of a judicial decision already made. Expediency and the need to promote certainty in judicial proceedings require that it should take " 'a clear expression of the legislative purpose to justify' a retrospective application of even a procedural statute so as to affect proceedings *previously taken* in such actions" (*Simonson v International Bank,* 14 NY2d 281, 289, quoting from *Coane v American Distilling Co.,* 298 NY 197, 204, 205). In this case, a clear indication from the Legislature is lacking, and so we hold that the 1981 amendment is not applicable to this proceeding. Naturally, in light of our holding, we need not examine respondent's arguments that application of the amendment would violate his constitutional rights.

Despite the inapplicability of the 1981 amendment to subdivision 12 of section 63 of the Executive Law, we are of the opinion that respondent's efforts to obtain a fuel surcharge from his tenants are subject to challenge by the Attorney-General, under the statute as it formerly read.

First, Special Term erred by analyzing the petition's first cause of action, alleging fraud with respect to the fuel surcharge, in isolation from the other allegations of fraud and illegality found in the petition. The statute allows the Attorney-General to bring a proceeding if it appears that there exist "repeated fraudulent or illegal acts" or "persistent fraud or illegality in the carrying on, conducting or transaction of business". The statute states that " 'persistent fraud' or 'illegality' * * * shall include continuance or carrying on of a fraudulent or illegal act or conduct". Special Term correctly acknowledged that the causes of action in the petition which pertain to various lease provisions "allege violative acts which derive from the utilization of the form lease which are continuous as to renewals and new tenants, and therefore can only be categorized as repeated or persistent acts within the meaning [of the statute]" (see *Matter of Lefkowitz v E.F.G. Baby Prods. Co.,*

40 AD2d 364, 367; cf. *State of New York v Princess Prestige Co.,* 42 NY2d 104, 107). With that predicate, the Attorney-General then may seek, among other things, "an order enjoining the continuance * * * of *any* fraudulent or illegal acts [and] directing restitution" (Executive Law, § 63, subd 12; emphasis supplied). There is no requirement in the statute, express or implied, that the Attorney-General may only seek relief with respect to fraudulent or illegal acts which are themselves repeated or persistent, once it appears that the business is conducted in a manner which can be characterized as persistently fraudulent or illegal. To the contrary, the use of the phrase "any fraudulent or illegal acts" indicates lack of limitation.

By restricting the Attorney-General's authority to seeking relief against businesses which engage in repeated or persistent fraud or illegality, the Legislature ensured that the Attorney-General would not be involved in every instance in which a business was guilty of some isolated wrongful act. However, the Legislature did not intend that, in cases where the Attorney-General was properly seeking judicial relief against a business for repeated or persistent fraud or illegality, he would have to turn a blind eye to wrongful acts of the business which could be characterized as singular.

We do not suggest, by our analysis of the statute, that the question of the Attorney-General's standing under subdivision 12 of section 63 of the Executive Law should be equated with his ultimate success on any of his claims. Rather, whether or not the Attorney-General has standing is something which may be determined from the face of the petition and from the nature of the claims asserted therein (see *Warth v Seldin,* 422 US 490, 500). Since the petition alleges activities which do, if existent, constitute repeated or persistent fraud or illegality, the Attorney-General may, under the statute, seek an order "enjoining the continuance of such business activity *or of any fraudulent or illegal acts*" (Executive Law, § 63, subd 12; emphasis supplied), including those acts which might be considered singular. Whether the Attorney-General is ultimately successful in proving any of his claims is something else again. If it turns out that the Attorney-General is unable

to prove the existence of any repeated or persistent fraud or illegality, then it is true that, under the statute, he cannot obtain a remedy with respect to some singular act of fraud or illegality, even if existent. That does not mean that, in the first instance, he lacked standing to seek judicial review of the singular act, but only that he has not made a threshold demonstration of his final right to a remedy (see *Alevy v Downstate Med. Center,* 39 NY2d 326, 338). In this case, however, Special Term has already held, in portions of the judgment not appealed from, that certain provisions in the lease were in violation of statute. It must then be considered established that, under the statute, respondent is guilty of "persistent * * * illegality". It is thus apparent that even if respondent's letters to the tenants concerning the fuel charge cannot be considered "repeated" or "persistent", the Attorney-General not only has standing to challenge the fuel surcharge on the grounds of alleged fraud, but has also made a threshold demonstration that, upon satisfactory proof, he will be entitled to relief with respect to the same.

The *Italian Line* case (*supra*) does not run contrary to this analysis of the statute. In that matter there was no allegation or evidence that the shipping line was guilty of persistent fraud or illegality in any form whatsoever. The only allegation there bore on the surcharge which was the result of a single, unilateral act. The reference in the memorandum decision of the Appellate Division, First Department, to "provisions of the contract" (56 AD2d 533, affd 43 NY2d 851, *supra*) does not pertain to claims of illegality or fraud separate from the accusation concerning the surcharge. Rather, this is a reference to the provisions in the contracts of passage which purportedly authorized the shipping company to levy the surcharge.

Even if we assume that Special Term was correct in examining the surcharge in isolation from other acts of alleged impropriety, we still differ from the conclusion it reached. In *Italian Line* (*supra*) the respondent imposed a surcharge on all tickets not yet fully paid for and issued. Not only was this measure reserved to it in its contracts of passage, such a reservation not being "suspect of an unconscionable or illegal scheme", but, as already noted, it was a

single act, although applicable to many persons. For that reason, the Court of Appeals held that it did not come under the statute (43 NY2d 851, 852, *supra*).

In this case, respondent sent out three sets of letters. The first set, the letter of June 25, 1979, informed those tenants who had not either just entered into a lease for the first time or recently renewed their leases that their rent would be increased by 5% or $10, as the case may be. The next letter, sent three days later to the recipients of the first letter and in response to widespread protest on the part of the tenants, indicated, among other things, that respondent was "requesting a rental increase" and that respondent would "waive the provisions of paragraph 32 in [the lease of any tenant who paid the surcharge] with regard to any further increases due * * * to the fuel crisis". Finally, on July 16, 1979, the third letter was sent, addressed to the tenants who were either new residents or had recently renewed their leases. According to this letter, respondent was "forced" to apply the surcharge even to these tenants because of "the cost of fuel oil continuing to increase at an alarming rate". Of course, the continuing increase in costs was no surprise to respondent, as he stated in the June 25 letter that "economic indicators predict that the costs will increase at least another 40% by the end of this year".

The three sets of letters are scarcely equivalent to the single act complained of in the *Italian Line* case. They can be characterized either as a "continuance or carrying on of * * * [an] act or conduct", or as "repeated * * * acts" as that phrase in the statute was interpreted prior to the 1981 amendment (cf. *Matter of Lefkowitz v E.F.G. Baby Prods. Co.*, 40 AD2d 364, *supra*).

Respondent cites *Matter of State of New York v Bel Fior Hotel* (74 AD2d 692) in support of the view that the fuel surcharge in this case must be considered a single act. That case is of questionable validity, since it seems to stand for the incorrect proposition that an unconscionable clause in a form contract affecting many persons cannot serve as the basis of a proceeding under subdivision 12 of section 63 of the Executive Law, as it formerly read (see discussion in part B, *infra;* see, also, *Matter of State of New York v Avco Fin. Serv.*, 50 NY2d 383, 389; *Matter of Lefkowitz v E.F.G.*

*Baby Prods. Co.,* 40 AD2d 364, 367, *supra).* In any event, *Bel Fior Hotel (supra)* is distinguishable, since the respondent hotel, at the close of the school term, retained the entire damage deposit of each of the 280 students who had been residing there. Such a measure can readily be characterized as a singular act, whereas the three letters at issue here were written on different dates, to different persons, and, at least in part, differed in content. The fact that they were all intended to elicit acquiescence in the fuel surcharge does not make them a single act; rather, they constitute continued or repeated acts designed to achieve one goal.

It is noted that the petition, dated December 19, 1979, does not mention respondent's letter of July 16, 1979. This may well be because the Attorney-General was simply ignorant of its existence when the petition was drafted. In any case, this letter was revealed to the court in an "affidavit in opposition" to the petition, served in March of 1980, in which respondent, through his attorney, asked the court "to review in its [*sic*] entirety letters prepared by the Respondent and sent to all of the residents of the two complexes. Said letters are dated June 25th, 1979, June 28th, 1979 and July 16th, 1979". In consideration of respondent's request, the petition should be considered amended to include in the first cause of action reference to the July 16, 1979 letter (CPLR 3025, subd [b]).

While we conclude that the first cause of action found in the petition, which alleges that the fuel surcharge was fraudulent under subdivision 12 of section 63 of the Executive Law, should not have been dismissed, we are of the view that summary judgment in favor of the State of New York, on this cause, is not warranted (cf. *Matter of State of New York v Daro Chartours,* 72 AD2d 872). The Attorney-General has pointed to various aspects of the letters from which it might be concluded that respondent is guilty of misleading and deceptive practices. On the other hand, at least to an extent, respondent did indicate in the last two letters that the surcharge was voluntary. This state of affairs requires a hearing, the issue being, on a fair consideration of the three letters and the circumstances of their mailing, the impression conveyed or fostered by the letters

(see *State of New York v General Motors Corp.,* 48 NY2d 836, revg 63 AD2d 885 on the dissenting opn of SILVERMAN, J. of the Appellate Division; cf. *Matter of People v Long Is. Home,* 32 AD2d 618).

## B

The statute under which the State of New York brought this proceeding (Executive Law, § 63, subd 12) includes "unconscionable contractual provisions" within the category of "fraudulent" conduct against which the Attorney-General may seek redress. It has been recognized for some time that leases are subject to judicial scrutiny under the concept of unconscionability (see *Martin Delicatessen v Schumacher,* 70 AD2d 1, 7-8, revd on other grounds 52 NY2d 105). The Legislature has codified the common-law doctrine of unconscionability and its application in the landlord-tenant context with the enactment of section 235-c of the Real Property Law (L 1976, ch 828; *35 Park Ave. Corp. v Campagna,* 48 NY2d 813).

"As a general proposition, unconscionability, a flexible doctrine with roots in equity * * * requires some showing of 'an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party'" (*Matter of State of New York v Avco Fin. Serv.,* 50 NY2d 383, 389, *supra,* quoting from *Williams v Walker-Thomas Furniture Co.,* 350 F2d 445, 449). This definition reveals two major elements which have been labeled by commentators, procedural and substantive unconscionability (see, e.g., Leff, Unconscionability and the Code — The Emperor's New Clause, 115 U Pa L Rev 485). The procedural element of unconscionability concerns the contract formation process and the alleged lack of meaningful choice; the substantive element looks to the content of the contract, per se (*Industralease Automated & Scientific Equip. Corp. v R.M.E. Enterprises,* 58 AD2d 482, 489, n 4 [HOPKINS, J.]). Examples of the former include, but are certainly not limited to, high pressure commercial tactics, inequality of bargaining power, deceptive practices and language in the contract, and an imbalance in the understanding and acumen of the parties. Examples of unreasonably favorable contractual provisions are virtually limitless but include inflated

prices, unfair termination clauses, unfair limitations on consequential damages and improper disclaimers of warranty (*Industralease Automated & Scientific Equip. Corp. v R.M.E. Enterprises, supra*).

In determining the conscionability of a contract, no set weight is to be given any one factor; each case must be decided on its own facts (*Matter of Friedman,* 64 AD2d 70, 85). However, in general, it can be said that procedural and substantive unconscionability operate on a "sliding scale"; the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa (Eddy, On the "Essential" Purposes of Limited Remedies; The Metaphysics of UCC Section 2-719[2], 65 Cal L Rev 28, 41-42, n 56). While there may be extreme cases where a contractual term is so outrageous and oppressive as to warrant a finding of unconscionability irrespective of the contract formation process (see, e.g., *Jones v Star Credit Corp.,* 59 Misc 2d 189, 192), such cases are the exception. Generally, there must be a showing of both a lack of a meaningful choice and the presence of contractual terms which unreasonably favor one party (*Matter of State of New York v Avco Fin. Serv., supra*). It should always be remembered in analyzing cases such as the one at bar that by definition "[a] lease agreement, like any other contract, essentially involves a bargained-for exchange between the parties. Absent some violation of law or transgression of a strong public policy, the parties to a contract are basically free to make whatever agreement they wish, no matter how unwise it might appear to a third party" (*Rowe v Great Atlantic & Pacific Tea Co.,* 46 NY2d 62, 67-68). The doctrine of unconscionability, with its emphasis on the contract-making process, is really an expression of, rather than an exception to, this principle. By focusing on the manner in which a contract is entered into and the status of the parties, the doctrine is designed to insure freedom of contract and not to negate it.

Whether a contract or a clause thereof is unconscionable or not is for the court to decide (*Wilson Trading Corp. v David Ferguson, Ltd.,* 23 NY2d 398, 403). The codifications of the doctrine make clear that where a contract provision may be unconscionable, the parties are to be afforded the

opportunity to present evidence (see Uniform Commercial Code, § 2-302, subd [2]; Real Property Law, § 235-c, subd 2). In *Wilson Trading Corp. v David Ferguson, Ltd.* (*supra,* p 404, n 2), the Court of Appeals left open the question of whether that meant that the court should hold an evidentiary hearing. That issue has now been laid to rest, in favor of the holding of a hearing (*Matter of State of New York v Avco Fin. Serv.,* 50 NY2d 383, 390, *supra*). The rule is that if it appears from the record before the court that unconscionability may exist, and the issue is not free from doubt, then the court must hold a hearing where the parties may present evidence with regard to the circumstances of the signing of the contract, and the disputed terms' setting, purpose and effect (*Blake v Biscardi,* 62 AD2d 975; *Zicari v Harris Co.,* 33 AD2d 17, 24; *Matter of People v Long Is. Home,* 32 AD2d 618, *supra;* cf. *Euclid Ave. Assoc. v City of New York,* 64 AD2d 550).

The question in this case then is whether the record presents an issue as to the existence of unconscionability which should not be resolved without a hearing. Special Term found that the Attorney-General had failed to submit evidence showing that any of the lease provisions was unconscionable. Citing *Matter of State of New York v Avco Fin. Serv.* (*supra*), the court stated that there was an absence of "factual proof in documentary or evidentiary form" as to unconscionability, and that, therefore, a dismissal of those portions of the petition alleging unconscionability was required.

In our view a hearing is required. The record indicates the possible existence of both the procedural and substantive elements of unconscionability.

We disagree with the Attorney-General's position that some or all of the challenged lease provisions are so egregious as to warrant a finding of unconscionability irrespective of what is termed here the procedural element of unconscionability. It does not seem to us that any of the leases' terms are so unbalanced. On the other hand, none of the disputed terms are so even-handed and patently justifiable as to lead us to conclude that irrespective of a lack of choice in the contracting process, the terms must be upheld. We do not consider it useful at this juncture to set

forth and examine the arguments of each side concerning the disputed clauses. Suffice it to say that a hearing, where the parties can present evidence as to the purpose, setting and effect of each of the disputed provisions, would be both useful and necessary.

Additionally and critically, a hearing will afford the parties the opportunity of demonstrating the existence or lack of meaningful choice on the part of the tenants. It is admitted that the lease is not negotiable and that a tenant cannot bargain over its individual terms. That fact alone warrants further inquiry by way of a hearing. In the circumstances of this proceeding brought by the Attorney-General, a comparison of the status and acumen of the landlord and his agents with that of any particular tenant would not be particularly material. Some tenants may be well educated, themselves versed in law and business, while others would be less experienced and poorly educated. Such factors, while clearly relevant in a case involving an individual tenant, are not so relevant here. On the other hand, we are not blind to the fact that respondent, a landlord owning two major apartment complexes, is a businessman with some expertise, who has had the benefit of expert help in drawing up the lease. Presumably, many, if not most, tenants are not in so advantageous a position (see *Seabrook v Commuter Housing Co.*, 72 Misc 2d 6). The court should examine the disputed provisions with a view to ascertaining whether an average tenant, living in these apartment complexes and unaided by legal advice, would quite possibly be deceived or misled, so as to affect the meaningfulness of his assent to each provision's terms. Another factor worthy of exploration is the housing rental market in the environs of the La Bonne Vie and La Bonne Vie II apartment complexes. If a perspective tenant does not like some of the terms of the lease, could he or she go elsewhere in the area and find a similar apartment, at a competitive price, with more favorable terms? Other factors relevant, in the circumstances of this case, to the meaningfulness of choice possessed by the tenants may also exist and should be explored at the hearing.

## C

The lease provides that a tenant's security "will be placed in an interest-bearing account and said interest,

less 1 per cent service charge, shall be paid to the Resident after expiration of the lease". The record reveals that it is respondent's practice to require that a tenant provide security in an amount equal to, at least, two months' rent.

■ The contention that the State of New York, through the offices of the Attorney-General, lacks standing to challenge the security provisions in the form lease is without merit. True, standing to challenge this particular provision may not be premised on subdivision 12 of section 63 of the Executive Law (*Matter of State of New York v Parker,* 30 NY2d 964). However, as of July 1, 1973, the Attorney-General was specifically empowered to bring an action or proceeding on behalf of the people of this State to compel compliance with the laws concerning tenants' security deposits (General Obligations Law, § 7-107; *Matter of State of New York v South Haven Houses Housing Dev. Fund Co.,* 46 NY2d 899; *Matter of People v Parker,* 38 NY2d 743, *supra*). The fact that the petition fails to cite the statute giving the Attorney-General standing is, at most, a defect of form, and the proceeding, insofar as it challenges a portion of the clause in the leases relating to interest on security deposits, should be deemed amended and brought under section 7-107 of the General Obligations Law (CPLR 103, subd [c]; *Matter of First Nat. City Bank v City of N. Y. Fin. Admin.,* 36 NY2d 87, 94).

The Attorney-General claims that the lease provision in question violates subdivision 2 of section 7-103 of the General Obligations Law, which reads as follows: "Whenever the person receiving money so deposited or advanced shall deposit such money in a banking organization, such person shall thereupon notify in writing each of the persons making such security deposit or advance, giving the name and address of the banking organization in which the deposit of security money is made, and the amount of such deposit. Deposits in a banking organization pursuant to the provisions of this subdivision shall be made in a banking organization having a place of business within the state. If the person depositing such security money in a banking organization shall deposit same in an interest bearing account, he shall be entitled to receive, as administration expenses, a sum equivalent to one per cent per

annum upon the security money so deposited, which shall be in lieu of all other administrative and custodial expenses. *The balance of the interest paid by the banking organization shall be the money of the person making the deposit or advance and shall either be held in trust by the person with whom such deposit or advance shall be made, until repaid or applied for the use or rental of the leased premises, or annually paid to the person making the deposit of security money"* (emphasis supplied). It is the Attorney-General's position that the italicized portion of this statute means that the tenant has the option of having the landlord either hold the interest in trust for him until the expiration of the lease, apply it for the use or rental of the premises, or remit it to the tenant on an annual basis. Respondent contends that the option to be exercised belongs to him, the landlord, and that, in any case, he does pay interest annually to any tenant requesting the same.

█ The 1970 amendment to section 7-103 of the General Obligations Law (L 1970, ch 1009), requiring the placing of security deposits in interest-bearing accounts, was a reaction to the holding in *Matter of State of New York v Parkchester Apts. Co.* (28 NY2d 842). The purpose of the requirement was "to put an end to the nonsense of security deposit manipulation by landlords" (*Matter of State of New York v Parker,* 30 NY2d 964, 966, *supra* [dissenting opn of JASEN, J.]). In light of this purpose and also taking into account the fact that a landlord holds a tenant's security in the capacity of a trustee (General Obligations Law, § 7-103, subds 1, 2), it is not surprising that the courts which have considered the issue have concluded that it is the tenant who has the option of choosing which alternative found in the statute should apply to the disposal of interest on his or her security (*Matter of People v Booke,* 58 AD2d 142, 146; *Parmaki v Levine,* 75 Misc 2d 900, 901). We are in accord with this interpretation of the statute. We only add that the statute does say that the interest can be "applied for the use or rental of the leased premises". If a tenant violates the terms of a lease, thereby justifying application of the security to payments due under the lease and if the security posted is less than the amount due, then the landlord would be justified in applying the interest to the

deficit (cf. *Glass v Janbach Props.*, 73 AD2d 106). Absent such a violation of the lease, however, the tenant should choose whether the interest, in excess of the 1% the landlord is permitted to retain, should be remitted to him annually, applied to rent due, or left in the trust account.

Special Term found that "[b]y accepting the lease, the tenants have voluntarily selected one of the options conferred upon them by General Obligations Law § 7-103 (2)". That is not the case. First of all, it cannot be said that a prospective tenant reading the clause in question would be aware that he had a statutorily imposed right of, among other things, having the accrued interest turned over to him annually despite the duration of the lease. The lease simply states that the interest will be remitted at the expiration of the lease. Signing the lease, absent language in that document informing the tenant of the alternatives required by section 7-103, cannot be taken as a selection of one of the alternatives. The fact that, apparently, respondent does annually turn over the accrued interest to those tenants who request it does not ameliorate the situation, since such a practice only favors those tenants who know their rights.

Secondly, subdivision 3 of section 7-103 provides that "[a]ny provision of such a contract or agreement whereby a person who so deposits or advances money waives any provision of this section is absolutely void." A lease term which states that interest on security will be returned at the lease's expiration, without explicitly offering to the tenant the choice of the other alternatives set forth in the statute, ostensively operates as a waiver of the options allowed tenants by the statute. It therefore follows that so much of paragraph 7 of the form lease which provides that the interest on a tenant's security, less a 1% service charge, "shall be paid to the Resident after expiration of the lease", is void as a matter of law.

There remains the question of the appropriate remedy. Present tenants should be notified in writing that the above-quoted portion of paragraph 7 of the form lease is void. The notification, which should be considered a rider to current leases, should give the tenants the option of having the interest directly remitted to them annually,

having it applied toward their rent, or letting it stay in the account, to be held in trust by respondent. Tenants choosing the first option who have more than one year accrued interest on their posted security should have their accrued interest remitted to them immediately. New leases and renewed leases should not contain the violative language, but should include a provision allowing the tenant the statutorily mandated options.

### CONCLUSION

Accordingly, the order of the Supreme Court, Suffolk County, dated March 3, 1980, which denied a motion by the State of New York to dismiss the action against it for failure to state a cause of action and for failure to join necessary parties, should be reversed, and the motion to dismiss should be granted. The order and judgment (one paper) of the same court, dated June 1, 1981 should be reversed insofar as appealed from, as hereinabove mentioned. The proceeding, brought by the State of New York, insofar as it challenges respondent's efforts to obtain a fuel surcharge from his tenants and alleges that certain lease provisions are unconscionable, should be remitted to Special Term for a hearing in accordance with the opinion of this court. The State should be awarded costs.

NIEHOFF, J. (concurring in part and dissenting in part). I agree with the majority that the suit brought on behalf of the landlord should be dismissed for failure to state a cause of action and for failure to join the tenants as necessary parties, and that the provision in the lease which governs interest on a tenant's security deposit should be declared void because it violates the General Obligations Law. Likewise, I concur in the majority's determination that a hearing should be conducted on the issue of the unconscionability of the provisions in the landlord's form lease dealing with (1) a 4% late charge (par 3 of the lease); (2) the collection of a 1% service charge from the interest earned on tenants' security deposits (par 7); (3) attorneys' fees in case of suit (par 31); (4) an increase in rent corresponding to an increase in fuel costs (par 34); (5) a charge for "unwarranted" service calls (item 15 of landlord's rules and regulations); and (6) a damage bond to be posted if a tenant keeps a pet (lease rider).

Although I agree that a hearing on the foregoing lease provisions is in order, my vote for a hearing should not be taken as an intimation that I am disposed to believe that the Attorney-General will be able to establish that such clauses are unconscionable. The Court of Appeals tells us that the doctrine of unconscionability is "not aimed at 'disturbance of allocation of risks because of superior bargaining power' but, instead, at 'the prevention of oppression and unfair surprise'" (*Matter of State of New York v Avco Fin. Serv.,* 50 NY2d 383, 389). Whether the challenged clauses can properly be classified as oppressive is, to me, truly questionable. Nevertheless, the unconscionability doctrine is a flexible one with roots in equity and, as such, is "intended to be sensitive to the realities and nuances of the bargaining process" (*Matter of State of New York v Avco Fin. Serv., supra,* pp 389-390). Consequently, the issue is best decided following an evidentiary hearing.

While I thus concur that a hearing is appropriate with respect to the allegedly unconscionable lease provisions, I am unable to agree with that branch of the majority opinion which remits for a hearing the issue of whether the landlord's actions designed to obtain a fuel surcharge during the 1979 oil crisis were fraudulent. In my opinion, Special Term was correct when it found that the allegedly fraudulent actions of the landlord in seeking such fuel surcharge do not give rise to any public remedy under subdivision 12 of section 63 of the Executive Law. Essentially, Special Term found that the landlord's efforts to obtain a fuel surcharge from the tenants prior to including a provision therefore in the form lease "cannot be considered a repeated or persistent act within the meaning of that statute" as it then read and that, therefore, the Attorney-General could not complain of such actions under the authority given him by the Executive Law.

In reversing Special Term's conclusion on that point the majority states that even if the landlord's letters to the tenants concerning the fuel surcharge cannot be considered "repeated" or "persistent" they can be challenged by the Attorney-General and that it was error for Special Term to analyze the first cause of action in isolation from the other allegations of fraud and illegality found in the

petition. The majority holds that if the Attorney-General can show that the questioned lease provisions are indeed "fraudulent or illegal", under the statute, then he will have demonstrated the existence of "persistent fraud or illegality" and "he then may seek, among other things, 'an order enjoining the continuance * * * of *any* fraudulent or illegal acts.'" What the majority seems to be saying despite disclaimer is that the Attorney-General's authority under the statute to prosecute the first cause of action (i.e., that relating to the fuel surcharge) hinges upon the success of the other causes of action in the petition which attack clauses in the lease. Adopting the majority's reasoning, it would appear to follow that if the Attorney-General fails to show that the contested lease provisions are unconscionable he then loses any authority under the statute to question the landlord's actions with respect to the fuel surcharge if the fuel surcharge is not a repeated or persistent act. In my judgment, either the authority existed *under the statute* for the Attorney-General to challenge the actions relating to the fuel surcharge at the time the lawsuit was undertaken by the Attorney-General, without regard to his ultimate success on other independent claims, or it did not exist at all. I fail to see how we can logically or legally conclude that the authority to challenge the attempted 1979 fuel charge pass along (which as will be seen, *infra,* was not actionable prior to a 1981 amendment of the subject statute) is dependent upon the Attorney-General's success in his attack on the allegedly unconscionable form lease. The landlord's letter request for the fuel surcharge is markedly different from a lease term or "unconscionable contractual provision" and simply cannot be grouped with the challenged lease provisions for the purpose of determining whether authority exists for the Attorney-General's challenge thereto. Stated otherwise, whether or not the Attorney-General has standing to prosecute the first cause of action is something which must be determined from the face of the petition and the nature of the claims asserted in that cause of action.

My view finds some support in the memorandum decision of the Appellate Division, First Department, in *Matter of State of New York v Italian Line* (56 AD2d 533, affd 43

NY2d 851), where that court appears to have held that the validity of a fuel surcharge is to be considered on its own merits and without regard to any claim of contract unconscionability. Thus, that court stated (p 533): "The statute under which this proceeding is brought is predicated upon a showing that the respondent in the proceedings 'shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business'. (Executive Law, § 63, subd 12.) We do not think that the imposition of this surcharge on previously contracted for passages made a year and one half before the petition in this case can fairly be called 'repeated' or 'persistent' within the meaning of this statute, *whether or not the provisions of the contract were so 'unconscionable' as to come within the definition of 'fraud' or 'fraudulent' in the statute*" (emphasis supplied).

Although the majority is of the view that it was error to examine the 1979 surcharge in isolation from the other acts of alleged impropriety, it goes on to say that even if it were to be so considered the three sets of letters "can be characterized as a 'continuance or carrying on of * * * [an] act or conduct', or as 'repeated * * * acts' as that phrase in the statute was interpreted prior to the 1981 amendment". I find myself unable to agree with that finding and conclude that the 1979 actions attributable to the landlord as they pertain to the fuel surcharge are not within the purview of the statute prior to its amendment. In a word, the actions of the landlord complained of were not forbidden or prohibited by the statute at the time this proceeding was commenced.

The majority holds that the 1981 amendment to subdivision 12 of section 63 of the Executive Law is not applicable to this proceeding and that the landlord's efforts to obtain a fuel surcharge from his tenants must be construed under the statute as it formerly read. I agree. The majority also holds that under the prior law a single act, although applicable to many persons, did not come within the statute (*Matter of State of New York v Italian Line,* 43 NY2d 851, affg 56 AD2d 533, *supra; Matter of State of New York v Bel Fior Hotel,* 74 AD2d 692). I agree. But, unlike the majority, I believe that the fuel surcharge in this case was a single act, not repeated acts.

In *Matter of State of New York v Italian Line (supra)*, the respondent steamship company unilaterally imposed a fuel surcharge on future sales of tickets as well as upon passengers who had previously booked passage on its vessels and who had not yet made full payment for their tickets. In affirming the Appellate Division, First Department, a unanimous Court of Appeals wrote that (p 852) "Italian Line was not shown to have engaged in any practice forbidden by subdivision 12 of section 63 of the Executive Law or to have engaged in such practice on a repeated or persistent basis."

In *Matter of State of New York v Bel Fior Hotel (supra)*, the Appellate Division, Third Department, refused to apply the former statute to 280 separate but identical rental agreements holding that:

"We do not believe that the provisions of a damage deposit clause in each of 280 separate but identical contracts can fairly be called 'repeated' or 'persistent' within the meaning of the statute. Respondent used the damage clause provision in connection with an unusual and unexpected request to provide housing for students who would otherwise lack shelter while attending college. Such an arrangement had not previously occurred despite the proximity of respondent's hotel to the college, and, given this proceeding, is unlikely to occur again. We perceive no distinction between the insertion of a common damage clause in multiple contracts to guard against reasonably perceived property damage and the imposition of a 'fuel surcharge' on contracts for ocean passage to protect against rises in the price of oil because of the 1973 oil embargo, which latter provision was found by the Court of Appeals to be neither a 'repeated' nor 'persistent' act or, in fact, unconscionable or illegal (*Matter of State of New York v Italian Line*, 43 NY2d 851, affg 56 AD2d 533). We reject the view that a single act contemporaneously affecting multiple parties is a 'repeated' or 'persistent' act."

In my view, the majority's attempt to distinguish this matter from the above cases is not persuasive. I believe that Special Term correctly resolved the fuel surcharge issue when it dismissed the first cause of action holding that: "The circumstances set forth above do not indicate

that LBV engaged in any practice forbidden by Executive Law § 63 (12), because LBV's actions with respect to obtaining a fuel surcharge from its tenants prior to the inclusion of ¶34 on riders and/or renewals cannot be considered a repeated or persistent act within the meaning of that statute, (*Lefkowitz v. Italian Line,* 56 A.D. 2d 533, 391 N.Y.S. 2d 132, aff'd 43 N.Y. 2d 851, 402 N.Y.S. 2d 1007). LBV's letters constituted one single act of soliciting money to defray the landlord's fuel costs. The court in so holding, does not approve or condone the practices of the respondent, but rather the court merely concludes that the acts in question do not give rise to any public remedy under Executive Law § 63 (12), as distinct from whatever private remedy the individual tenants may possess. However, the court does note that the tenants were not compelled to make the requested payments. In fact, many tenants ignored the request and the landlord did not take any further action against them."

With respect to the 1979 fuel surcharge the petition of the Attorney-General alleges that the tenants were required to sign leases on a "take-it-or-leave-it" basis (par SIXTH) and that the form lease did not "authorize the landlord to make any assessments against the tenants or to increase rents due to increased energy costs" (par SEVENTH). In the EIGHTH paragraph, the petition alleges that "on or about June 25, 1979, respondent sent a letter to each tenant advising him/her that, effective July 1, 1979, the rent would be increased 5% in the case of the Coram tenants, and a flat $10 in the case of the East Patchogue tenants, due to the increase in fuel costs." As we know, three days later, the landlord sent the following letter to those tenants who had received the earlier letter.

"June 28, 1979

"Dear Resident:

"A few days ago on June 25th, you received a letter from me regarding the energy crisis and requesting a rental increase for your apartment at La Bonne Vie.

"It has come to my attention that as a result of our letter a great many residents are confused as to our intention, and are furthur [*sic*] confused by the numerous rumors spreading throughout the development.

"The purpose of this letter is to put your mind at ease, clarify our original intentions, and put an end to the numerous false rumors that are circulating around La Bonne Vie.

"It appears that the greatest fear the residents have regarding this energy increase is that it is the first of many increases that they will have to absorb. Another concern is that they are still subject to further increases pursuant to paragraph #32 of their lease.

"It was our original intention and continues to remain our intention to give each resident that pays the ten dollar energy increase a rider to their [sic] current lease which guarantees the new ajusted [sic] rent for the balance of it's [sic] term. Furthurmore [sic], we will also waive the provisions of paragraph 32 in their [sic] lease with regard to any furthur [sic] increases due either to the fuel crisis or any other provision in this paragraph.

"Thank you for the opportunity to furthur [sic] explain our position with regard to my letter of June 25th, and should you require any additional information please contact any member of my office staff who will be more than happy to discuss the situation with you.

"Very truly your [sic],

"La Bonne Vie Apartments".

The petition goes on to allege that the statements made in the above letter "were false and deceptive and created the mistaken belief among many tenants that the rent increase was authorized by lease clause 32 when in fact it was not" (par ELEVENTH); that by the insertion of a fuel oil clause in subsequent leases the landlord "conceded that the prior leases absent such riders, do not authorize such 'energy increases' as he has claimed in his June 25 and 28 communications to the tenants" (par SEVENTEENTH); and that the landlord's "characterization of this fuel cost surcharge as an assessment authorized under the terms of the lease when such is not the fact is both misleading and deceptive" (par EIGHTEENTH) mandating relief pursuant to subdivision 12 of section 63 of the Executive Law.

The first cause of action of the petition (dated Dec. 19, 1979, long after the circulation and receipt of the answers

to the questionnaire sent to the tenants by the Attorney-General) refers to the afore-mentioned two letters and makes mention of no other communication or acts done by the landlord with respect to the allegedly improper fuel surcharge. Be that as it may, even considering the third letter dated July 16, 1979 (which was sent to different recipients from those receiving the earlier letters — i.e., new tenants or tenants who had just renewed their leases and were unaffected by the landlord's acts up to that time), I fail to see how the three letters can be construed as anything other than a single attempt to impose a one time fuel surcharge on all of the tenants in the landlord's buildings. Such a single attempt, prior to the statutory amendment which defined "repeated" for the first time as including separate conduct which affects more than one person, cannot be challenged by the Attorney-General.

Accordingly, I would affirm so much of the order and judgment appealed from as dismissed the first cause of action in the petition and would otherwise concur with the majority.

LAZER, J. P., and BOYERS, J., concur in the opinion of GIBBONS, J.; NIEHOFF, J., concurs in part and dissents in part, with an opinion.

(1) Order and judgment (one paper) of the Supreme Court, Suffolk County, dated June 1, 1981, reversed insofar as appealed from, on the law, the first, second, third, seventh, eighth and ninth decretal paragraphs are deleted, the appellant's petition is amended in accordance with the opinion herein, and it is determined that so much of paragraph 7 of the form lease which provides that the interest on a tenant's security, less a 1% service charge "shall be paid to the Resident after expiration of the lease", is void as a matter of law, and (2) order of the same court dated March 3, 1980, which denied the State of New York's motion to dismiss the action against it for failure to state a cause of action and for failure to join necessary parties, reversed, on the law, and motion granted, and proceeding by the State of New York remitted to the Supreme Court, Suffolk County, for further proceedings consistent herewith. The respondent is to comply with the directions set forth in the opinion herewith with respect to the inter-

est on the tenants' security within 30 days after service upon him of a copy of the order to be made hereon, with notice of entry.

One bill of costs is awarded to the State of New York.