**305 EAST 24TH OWNERS CORP.**, Anthony S. Niskanen, Sherry Kain, Jean Mullens, Ellen Fishman, Donald H. Layton, and Mort Schwartz, Plaintiffs,

v.

**PARMAN CO.**, Dicta Realty Associates, Jack Parker, Harold R. Liebman, Seymour Sadkin, Parman Corp., East 24th Garage Corp., East 24th Commercial Corp., and East 24th Laundry Corp., Defendants.

No. 85 Civ. 3788 (KMW).

United States District Court,
S.D. New York.

June 2, 1989.

Yvette Harmon, Moore, Berson, Lifflander & Mewhinney, New York City, for plaintiffs.

Robert Wolf, Robinson, Silverman, Pearce, Aronsohn & Berman, New York City, for defendants.

## OPINION

KIMBA M. WOOD, District Judge.

This action challenges the legality of four long term leases entered into by the tenant plaintiffs when they became cooperative owners of the building in which they formerly had lived as rent stabilized tenants. Plaintiffs seek to invalidate leases for commercial management services, garage services, laundry services, and building management services on the ground that the building owner's insistence that the leases accompany any sale of the building constituted an illegal tying arrangement under Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs further contend that the commercial management lease is unenforceable under the common law doctrine of unconscionability. Following a

five day bench trial, the Court finds in favor of defendants on both claims.

## PROCEDURAL HISTORY

In an earlier ruling in this case, Judge Robert J. Ward[1] of this Court held that plaintiffs' termination of the Garage Lease and Laundry Concession Agreement, pursuant to a vote of its shareholders conducted in July of 1985, was valid under 15 U.S.C. § 3607 of the Condominium and Cooperative Abuse Relief Act of 1980 (the "Abuse Act"). Judge Ward's Decision and Order, dated April 28, 1987, also held that the Commercial Lease was not properly terminable by Owner's Corp. under the Abuse Act. In light of that decision, the parties entered into a Stipulation pursuant to which defendants Garage Corp. and Laundry Corp. turned over the operation of the garage and laundry operations to Owners Corp. without prejudice to defendants' right to appeal. Accordingly, plaintiffs' claims under the Abuse Act are not presently at issue.

## THE PARTIES

Plaintiff Owners Corp. is a New York corporation that owns and operates a cooperative building located at 305 East 24th Street in New York City ("the Building"). The individual plaintiffs were directors of Owners Corp. at the time the Complaint was filed, and with the exception of plaintiff Mort Schwartz, are all current tenant-shareholders of 305 East 24th Owners Corp. They acquired their respective shares on October 25, 1984 pursuant to the cooperative offering plan as amended (the "Plan").

At the times relevant to this action, defendant Parman Co., the Sponsor of the Plan, was a sole proprietorship through which defendant Jack Parker conducted business. From 1980 to 1984, Parman Co. sponsored eight cooperative conversions in New York City. Seven, including the conversion in question here, were in Manhattan; one was in Queens, New York. These conversions involved approximately 3,000 apartments.

Defendant Dicta Realty is a New York general partnership that owned the Building prior to the cooperative conversion on October 25, 1984. Prior to the sale of the Building, Mr. Parker's interest in Dicta Realty was 30 percent; following the sale his interest was 90 percent. As of October 26, 1984, Mr. Parker also owned a 90 percent interest in Garage Corp., Commercial Corp., and Laundry Corp.

Defendant Harold R. Liebman was a general partner of Dicta Realty and was designated in the Plan as attorney for the Sponsor. Prior to October 25, 1984, Mr. Liebman's interest in Dicta Realty was 3.33 percent; after October 25, 1984, his interest was 10 percent. As of October 26, 1984, Mr. Liebman owned a 10 percent interest in Garage Corp., Commercial Corp., and Laundry Corp.

Defendant Seymour Sadkin was a general partner of Dicta Realty until about October 24, 1984.

Defendant Parman Corp. is a New York Corporation that acted as managing agent for Owners Corp. from October 25, 1984 through October 31, 1987. Mr. Parker is the principal shareholder of Parman Corp.

Defendant Garage Corp. is a New York Corporation that was the lessee under a garage lease for the garage space in the Building. It was incorporated for the principal purpose of holding the Garage Lease and has had no assets since November 1, 1987 when it was required by order of Judge Ward to turn the Lease over to Owners Corp.

Defendant Commercial Corp. is a New York corporation that was and is the lessee under a master commercial lease (the "Commercial Lease") for the commercial space in the Building. It was created for the principal purpose of holding the Commercial Lease and has no assets other than that lease.

Defendant Laundry Corp. is a New York corporation that was the concessionaire under the laundry concession agreement for

---

**1.** This case was randomly reassigned to this judge on July 29, 1988 pursuant to Rule 12 of the "Rules for the Division of Business Among District Judges—Southern District."

the operation of the laundry facility in the Building.

BACKGROUND

Plaintiffs were first notified of defendants' intention to convert their rent stabilized apartments to cooperative ownership in August of 1980 when the Sponsor submitted a preliminary version of its offering plan to the New York State Attorney General for review. This preliminary prospectus, commonly known as the "red herring," was an eviction cooperative conversion plan; that is, it provided that in the event a tenant chose not to purchase the shares of Owners Corp. allocated to his or her apartment, the tenant would have to vacate upon the cooperative conversion of the Building.

In early September of 1980, shortly after the distribution of the "red herring" to the tenants of the Building, plaintiff Anthony S. Niskanen and his co-tenant Marilyn Klein sent a memorandum to all tenants-in-occupancy at 305 East 24th Street (the "Tenants") advocating the formation of a tenant organization to "substantially improve the position" of the Tenants with respect to the "red herring," and proposing a meeting of all Tenants. The two page memorandum also noted "*A FEW CONTROVERSIAL HIGHLIGHTS FROM THE PROPOSED PLAN*," including "[t]he owners intend to retain a 40 year sweetheart deal on the garage and stores [the commercial lease]—just look at the rentals for the first 5 years: ...." Defendants' Trial Exhibit ("DTE") A.

Following several meetings, the Tenants formed the 305 East 24th Street Tenants' Association (the "Tenants Association"). The purposes of the Tenants Association, as set forth in its Articles of Association, were, in part, to disseminate information to the Tenants, to hire and supervise experts who would advise the Tenants, and to "secure unified action in advancing the common interests and purposes of members of the association...." DTE D. The Tenants Association included a tenants council (the "Council") that consisted of 39 floor representatives and was responsible for management of the Tenants Association, and an Executive Committee that was responsible for the day-to-day management of the Tenants Association. The Tenants Association organized five standing committees: Finance, Legal, Building, Communications, and Political Action.

On October 6, 1980, the Council of the Tenants Association elected the following individuals, among others, to the Executive Committee of the Tenants Association: President—plaintiff Niskanen; Vice–President—plaintiff Schwartz; Treasurer—plaintiff Donald H. Layton; Secretary—plaintiff Jean Mullens. These officers were reelected in each subsequent election of the Executive Committee and served continually until October 25, 1984, the date the Building was converted to cooperative ownership.

In mid-October of 1980, the Legal Committee of the Tenants Association interviewed approximately ten recommended attorneys to represent the Tenants Association during the conversion process. In November of 1980 the Tenants Association selected and retained the law firm of Sonnenschein, Sherman & Deutsch (the "Sonnenschein Firm"). Irving Sonnenschein, lead counsel for the Tenants, testified that he has represented tenants' associations in over 50 cooperative conversions, most of which were in New York City.

Beginning in early March of 1981, in an effort to present a unified position in dealings with the Sponsor, the Tenants Association and its counsel distributed no-buy agreement forms (the "No–Buy Agreements") to the Tenants. The No–Buy Agreements state that each Tenant who signed a No–Buy Agreement would "not sign or submit to the Sponsor ... a Subscription Agreement to purchase shares allocated to any apartment in the Building ... [pursuant to the terms of the Plan] or any modified Plan" unless the Tenant was released from the No–Buy Agreement. DTE J. By May 1981 over 80% of the Tenants had signed No–Buy Agreements. In December of 1981, Irving Sonnenschein met with counsel for the Sponsor to urge the Sponsor to change certain provisions of the proposed offering plan. Mr. Sonnenschein could not recall at trial which provi-

sions were discussed, but he did testify to having "lots of discussions" with representatives of the Sponsor before the Plan was filed. Trial Transcript ("Tr.") at 331.

On January 25, 1983, the black book version of the offering plan (the "Black Book") was accepted for filing by the Attorney General's Office. The Black Book, as presented to the Tenants in February 1983, was approximately 230 pages in length and contained the Sponsor's proposed Plan for converting the Building to cooperative ownership. On the cover page of the Black Book, directly under the title, are the words, in large bold face type: "See 'Special Risks' Page 1." Under the section entitled "Special Risks," located on page 1, are the words:

2. The Plan provides for leases of the garage space and commercial space by the Apartment Corporation to the Owner of a related entity. These leases may not be "arms-length" transactions and may result in the Apartment Corporation's realizing *less* than the full economic value of the garage-space and commercial space. The difference realized over the terms of such leases may be deemed additional profit to the Owner [emphasis in original].

3. Furthermore, over the years the rent payable under these leases may become

increasingly less than the said portion of the Apartment Corporation's aggregate costs in maintaining these spaces. See Section V ("Garage Lease" and "Master Commercial Lease").[2]

Plaintiffs' Trial Exhibit ("PTE") 2.

The terms and conditions of the Garage Lease, Commercial Lease and Management Agreement were the same in the Black Book as in the "Red Herring." Unlike the preliminary plan contained in the "Red Herring," however, the Black Book proposed a non-eviction plan.[3] The price per share for the Tenants (the "insider price") pursuant to the Black Book was $80.00; the price per share for non-tenant purchasers (the "outsider price") was $100.00.

The Tenants continued to meet on a regular basis following the issuance of the Black Book. According to the minutes of April 5, 1983 meeting of the Council of the Tenants Association, Mr. Niskanen, the Tenants Association's President, discussed the "Negotiation Process" and established a "Negotiation Team" consisting of representatives of the Tenants Association and its counsel. DTE O. Secretary Mullens' minutes further stated that the goal of the "Negotiation Team" was to "restructure the Plan." *Id.* The "Negotiation Team" included, among others: plaintiffs Niskanen, Schwartz, and Sherry Kain; tenant

---

**2.** As stated in the Plan as adopted, the Garage Lease had a 20–year term plus a 20–year renewal option through the year 2024, exercisable at the option of Garage Corp. The Garage Lease provided that Garage Corp. would pay to Owners Corp. a base rent in the amount of $35,000 for each of the first five years of the Lease with an increase of $5000 for every five years thereafter through the remainder of the term. The Garage Lease also required Garage Corp. to pay to Owners Corp., as additional rent, 4.9 percent of the increase in the real estate taxes, heating, utilities and insurance costs incurred by Owners Corp. over the corresponding costs incurred during the base year of 1984–85. Finally, under the Garage Lease, Garage Corp. was to make all structural repairs which became necessary as a result of Garage Corp.'s use of the premises.

The Commercial Lease also contained a 20–year term plus a 20–year renewal option through the year 2024, exercisable at the option of Commercial Corp. The Commercial Lease provided that Commercial Corp. would pay to Owners Corp. base rent in the amount of $65,-

000 for each of the first five years of the Lease with an increase of $5000 for every five years thereafter through the remainder of the term. The Commercial Lease required Commercial Corp. to pay Owners Corp., as additional rent, 1.84 percent of the increase in real estate taxes over the base tax year of 1984–85.

As provided for in the Fifth Amendment to the Plan, the Laundry Concession Agreement had a term of 15 years. Laundry Corp. paid to Owners Corp. an annual concession fee of $18,-000.

The management agreement between Owners Corp. and Parman Corp. as manager (the "Management Agreement") had a term of three years and a base fee of $75,000 per annum. The Management Agreement expired on October 31, 1987 at which time Parman Corp. ceased to be the managing agent.

**3.** Under a non-eviction cooperative conversion plan, tenants who elect not to subscribe to the offering plan have the option of remaining in their apartments as rent stabilized tenants.

Klein; and lawyers Sonnenschein and Richard Feldman (an associate at the Sonnenschein Firm).

At each of the meetings held between representatives of the Tenants Association and the Sponsor after the Black Book was filed, Mr. Sonnenschein was present as counsel for the Tenants Association. On August 12, 1983, Mr. Sonnenschein sent a letter to Richard Liebman of Lieb and Samnick (the firm retained by the Sponsor to represent Owners Corp. during the pre-conversion period) outlining the "basic elements" of the Plan that had been discussed between the Tenants Association and Liebman up to that time. DTE BB. The "basic elements" referred to in Sonnenschein's letter included: 1) a reduction in the insider "cash price per share" equivalent to $13,000 per room; 2) a "reserve fund of $600,000 to be paid at closing plus $1000 per room for each apartment as and when sold;" and 3) a modification of the Commercial Lease to provide for a real estate tax escalation, and for "some [rental] increase which would reasonably reflect the economic situation." *Id.*

On September 15, 1983 the Tenants Association distributed a newsletter to the Tenants reporting that they had "begun to make progress in the negotiations with the Sponsor." DTE P. The newsletter stated that: 1) the Sponsor's representatives told the Tenants Association's representatives that "they are now willing to consider 'significant' changes in the terms and conditions of their offering plan to make it more attractive to tenants to buy;" 2) the Sponsor would not submit the First Amendment to the Plan to the Attorney General's office until they "reached as much agreement as possible" with the Tenants Association; 3) under discussion between the Tenants Association and Sponsor were "a combination of improvements in the amount of 'insider discount,' increases in amount of rent paid to Coop Corporation for the stores and garages, and the amount of the building's reserve fund;" and 4) if the Tenants Association "continue[d] to make satisfactory progress in negotiations [with the Sponsor,] a revised plan could be released sometime during the fourth quarter [of 1983]." *Id.*

On October 7, 1983 Mr. Sonnenschein sent a letter to Mr. Niskanen in his capacity as President of the Tenants Association setting forth a new proposal which had been made to Mr. Sonnenschein by the Sponsor. DTE CC. This latest proposal called for amending the Black Book by: 1) reducing the insider price per room to $16,500 or $16,000, if a given number of Tenants subscribed, 2) establishing an increased reserve fund of $650,000, 3) providing for a transfer fee or flip tax to be assessed against tenant-subscribers to the Plan who subsequently sold or flipped their shares to third parties at a profit, 4) reducing the down payment required to be made by Tenants who wished to subscribe to the Plan, and 5) giving tenant-subscribers the right to assign their subscription agreements without the Sponsor's consent. *Id.*

On about February 15, 1984, the Tenants Association distributed a newsletter to the Tenants which stated that "[its] attorneys [would] be reviewing the specifics of a series of improvements to the current plan proposed by [the Sponsor]" including "an improvement in the discount offered to insiders," and an "increase of the base rental for the commercial lease with tax pass throughs." DTE Q.

The First Amendment to the Plan was accepted for filing by the Attorney General's office on April 6, 1984. The insider price of $80.00 per share provided for under the Black Book was reduced to $56.37 per share, the down payment required to be paid to the Sponsor by each tenant-subscriber was reduced from 10% of the total purchase price to a flat sum of $1000, financing was provided for those tenants unable to obtain it on their own, and the Tenants Association was reimbursed for legal fees in the amount of $35,000. *See* PTE 3.

At a general meeting of the Tenants Association on April 19, 1984, after Messrs. Sonnenschein and Niskanen answered questions from the Tenants regarding the Plan, the Executive Committee recommended that those Tenants who had previously executed No–Buy Agreements sign

"Releases" releasing all such Tenants from those Agreements. The Releases became effective then, when more than two-thirds of the Tenants who originally signed No–Buy Agreements submitted signed "Releases."

The Plan was declared effective on April 24, 1984 when subscription agreements for 101 of the 386 apartments had been signed.[4] By October 25, 1984—the day of closing—85% of the Tenants, including each of the individual plaintiffs, had executed subscription agreements.

In retrospect, plaintiffs believe that the optimism expressed in their earlier newsletters was misplaced. According to Mr. Niskanen, the Tenants were "naive" to think that the Sponsor had any intention of changing its initial position; rather, he is convinced that the Sponsor predetermined an acceptable profit on the sale of the Building, inflated its preliminary offer, and adopted through "negotiations" only suggestions that were either mutually beneficial or of no consequence to the Sponsor. Mr. Niskanen further testified that the Sponsor, not content to extract every dollar of profit from the sale of the Building, conditioned the sale of the Building on plaintiffs' acceptance of the leases at issue in this suit.

At trial, Tenants Niskanen, Klein, and Schwartz along with Tenants' attorney Sonnenschein testified that defendants never actively negotiated with the Tenants over the presence of the leases. While at least ten meetings were held over more than a year period, plaintiffs testified that the Sponsor adamantly refused to consider eliminating the leases from the offering Plan. Plaintiffs presented testimony that defendant Liebman, the Sponsor's primary spokesperson during the conversion process, stated unequivocally that the existence of the leases was "non-negotiable." Mr. Niskanen testified that Mr. Liebman refused to discuss any of the Tenants' major concerns: during one meeting, for example, he stood up and put his coat on when the need for Building repairs was discussed; at another he disgustedly threw down an engineering report presented to him by the Tenants.

Defendants, on the other hand, claim that they negotiated in good faith regarding several provisions of the Plan and deny that either the Tenants or their lawyers ever asked them to quote a price per room exclusive of the leases. Messrs. Liebman and Berkowitz both testified that they negotiated a package deal with the Tenants compromising on several key areas in order to reach a mutually acceptable offer. For example, defendants note, the Sponsor agreed to change the Plan from eviction to non-eviction, to reduce substantially the insider price, to increase the Building's reserve fund, to put a cap on closing adjustments, to reduce individual Tenants' required down payments, and to extend the exclusive buying period.

Defendants also point out that plaintiffs were represented by both legal counsel and a real estate consultant who were well acquainted with the cooperative conversion process and who understood the full implications of the long-term leases. The Tenants' real estate consultant Edward S. Elliman, for instance, stated in his written review of the Black Book and First Amendment (which he conducted at the time they were issued) that the terms of the leases were unreasonably long and that anticipated revenues to the Cooperative Owners Corp. would be too low. Mr. Sonnenschein testified that he told the Sponsor several times during the conversion process that the leases were unfair. The defendants maintain that if the Tenants believed the leases were so one-sided, they could have refused to subscribe to the Plan. They point to the conversion of one of their apartment buildings, in Queens, where when the tenants refused to subscribe to a plan that included long term leases, the

---

**4.** Under New York law the Sponsor could have converted the Building as soon as subscription agreements were obtained from 15% of the apartments—a number that both parties acknowledge the Sponsor could have readily obtained. The owners of the Building had an incentive to convince a higher percentage of Tenants to subscribe, however, because those who chose not to buy had the option of remaining as rent stabilized tenants.

Sponsor removed the contested provisions. Defendants also argue that the 80 percent of the Tenants who initially signed "No–Buy Agreements" could have refused to release their pledges if they thought the Plan was unfair.

In rebuttal, plaintiffs claim that once the Sponsor changed the plan from eviction to non-eviction, it was a foregone conclusion that the conversion would go through. According to the testimony of tenant Klein (an attorney who informally advised the other Tenants) "[w]ith the Black Book change to a non-eviction plan, it was my informed opinion that the No–Buy Pledge was no longer effective." The grounds for Ms. Klein's belief were not made clear at trial. In fact, as previously discussed, the Tenants Association itself formally requested that the Tenants rescind their "No–Buy Agreements" after the First Amendment was filed. Plaintiffs suggest that even accepting *arguendo* that the Sponsor may have been willing to remove the leases from the overall Plan in exchange for more favorable terms on other provisions, the Tenants Committee did not have authority from the Tenants to negotiate with defendants on their behalf. According to President Niskanen, the Tenants Committee did not have authority to bargain; its only role was to convey the concerns of the Tenants to the Sponsor. Messrs. Niskanen and Sonnenschein also testified that the Tenant Committee's lawyer had no authority to "make a deal" with the Sponsor.

Plaintiffs admit that they willingly purchased the package deal offered by the Sponsor, but claim that they did so only because the alternatives were worse. Remaining in their apartments after the conversion as rent stabilized tenants, they contend, would have been precarious because of the possibility that the New York state legislature would decide not to continue rent stabilization and because they were concerned that non-owners living in a cooperative building would receive substandard treatment. According to plaintiff Schwartz, "[w]e felt as if we did not buy, we were at the mercy perhaps of some doctor in Arizona who might own our apartment, and of course the possibility that the rent stabilization would not continue to be renewed." Tr. at 522.

Moreover, finding a comparable apartment elsewhere at a similar price did not appear to present a feasible alternative for most Tenants. Mr. Schwartz testified that upon learning that the owner intended to convert the Building to a cooperative, I "did some shopping around and quickly realized that we could not replace what we had in the apartment.... The most comparable thing we could find ... was about 75 percent more in cost and about 50 percent less in size." Asked by his lawyer why he eventually purchased, Schwartz testified, "Frankly, Ms. Harmon, the price that was offered to us was really too good to pass." Tr. at 521.

## DISCUSSION

### 1. *Subject Matter Jurisdiction*

■ Defendants contend that this Court lacks subject matter jurisdiction over plaintiffs' antitrust claim. The jurisdictional requirement of the Sherman Act can be satisfied under either the "in commerce" test or the "effect on commerce" test. *McLain v. Real Estate Board of New Orleans, Inc.*, 444 U.S. 232, 242, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980). Thus, plaintiffs must demonstrate "either that the defendants' activity is itself in interstate commerce or, if it is local in nature, that it has an effect on some other appreciable activity demonstrably in interstate commerce [citation omitted.]" *Id.*

■ Plaintiffs claim that they have established subject matter jurisdiction under the "effect on commerce" test. The Second Circuit has adopted a narrow view of the *McLain* "effect on commerce" test: "the inquiry must be whether the defendant's activity that has allegedly been 'infected' by unlawful conduct can be shown 'as a matter of practical economies' to have a not insubstantial effect on the interstate commerce involved." *Furlong v. Long Island College Hospital*, 710 F.2d 922, 926 (2d Cir.1983) (citing *McLain*, 444 U.S. at 246, 100 S.Ct. at 511; *see also Wells Real Estate v. Greater Lowell Board of Real-*

*tors*, 850 F.2d 803, 808 (1st Cir.1988) (" 'a plaintiff need not prove that a defendant's unlawful activities *actually* affected interstate commerce; but ... (rather) that defendants' [sic] business still must be so connected with interstate commerce that it is logical, as a matter of practical economies, to believe that the unlawful activity will affect interstate commerce.' ")

Defendants contend that their activities were purely local in nature and do not fall within the reach of the federal antitrust laws. This Circuit has yet to apply the *McLain* decision to a tying case and there is little guidance from other Circuits. In *Rosebrough Monument Co. v. Memorial Park Cemetery*, 666 F.2d 1130 (8th Cir. 1981), the Eighth Circuit, which also applies a narrow interpretation of *McLain*, stated that

> [r]egardless of how local the immediate effect of an activity might be, if the activity has a substantial and adverse effect on interstate commerce, the arrangement falls within the expansive reach of the Sherman Act.

*Id.* at 1144 (citation omitted). Defendants' activity here allegedly infected by unlawful conduct is its sale of the Building together with the contested leases. Plaintiffs failed to offer any evidence at trial as to the geographic boundaries of the tied product market; however, because of New York City's proximity to New Jersey and Connecticut, the Court takes judicial notice of the fact that out-of-state businesses providing garage, laundry, and commercial management services would have been precluded from competing for this business had this Court found that defendants engaged in an illegal tying arrangement.

Moreover, plaintiffs have shown that four subscribers, whose purchases had a value of at least $300,000, resided outside of New York State at the time of closing. Affidavits of Fritzhand, Diamond, Garrett, and Berkowitz. The Court finds that this in itself is sufficient (albeit barely) to establish subject matter jurisdiction under the "in commerce" prong of *McLain*.[5]

### 2. *The Tying Claim*

■ Plaintiffs charge that defendants imposed a tying arrangement in violation of Section 1 of the Sherman Act.[6] A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

■ To establish the existence of an allegedly unlawful tying arrangement, a plaintiff must prove five elements: 1) the existence of separate tying and tied products; 2) actual coercion by the seller that forced the buyer to accept the tied product; 3) that the seller had sufficient economic power held by the seller in the tying product to coerce purchaser acceptance of the tied product; 4) anticompetitive effects in the tied market; and 5) a not insubstantial effect on interstate commerce. *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 56–57 (2d Cir.

---

**5.** Defendants argue that because each tenant at the time of subscription represented to the Sponsor that he or she was a resident of New York State, these tenants should now be estopped from claiming that they resided outside of New York when they purchased their apartments. Defendants' Post–Trial Memorandum of Law at 12–13. The Court here is concerned only with whether, as a factual matter, defendants' alleged tying arrangement involved interstate commerce; misrepresentations tenants allegedly made at the time of subscription are relevant only to the extent defendants claim the tenants are presently not being truthful. The Court, however, credits the affidavits. Moreover, the documents that defendants claim "contain[ ] an affirmative representation by each subscriber that he or she was a resident in the

State of New York," *Id.* at 12, do not in fact show that all subscribers resided in New York State. *See* DTE TTT (Subscription Agreements of Brownstein (Pennsylvania address listed), Katz (Connecticut address listed), Harrari (Virginia address listed), Stockman (California address listed), Garrett (New Hampshire address listed)). In addition, over 40 of the subscription agreements list no address. DTE TTT.

**6.** Section 1 of the Sherman Act, 15 U.S.C. § 1 (1983), reads in pertinent part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal.

1980); *Power Test Petroleum v. Calcu Gas,* 754 F.2d 91, 96 (2d Cir.1985).

■ Economic power in the market for the tying product is the most crucial element under the above analysis:

> [the] essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying market to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated.

*Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984).

### a. *Existence of two separate products.*

The Court finds that there exist separate tying and tied products. The Court rejects defendants' argument that the sale of the cooperative units to the tenants—the tying product—and the entry into the leases—the tied product—were part and parcel of one integrated offering Plan and should thus be viewed as a single product. This argument is not consistent with the Supreme Court's most recent product definition test. *Jefferson Parish,* 466 U.S. at 18–19, 104 S.Ct. at 1561–1562, rejected the argument that a hospital's packaging of anesthesiology services together with other treatment necessary for surgery constituted a "functionally integrated package of services"; instead, the Court concluded that "the answer to the question whether one or two products are involved turns on the character of the demand for the two items." *Id.* at 19, 104 S.Ct. at 1561. In this case the products at issue are separate if there is a demand for commercial, garage, laundry and building management services separate from the demand for a cooperative apartment. Testimony offered by the plaintiffs supports such a contention. In the six other buildings that the Sponsor converted, the tenants purchased their cooperative apartments exclusive of any leases. Moreover, other courts have treated management services and condominiums as two separate products. *Jones v. 247 E. Chestnut Properties,* 1975–2 Trade Cases (CCH), ¶ 60,491 (N.D.Ill.1974); *Jack Walters & Sons Corp., v. Morton Building, Inc.,* 737 F.2d 698, 703 (7th Cir.1984) (Posner, J.) (suggesting that post-*Jefferson Parish,* separate markets exist for condominium and real estate management services).

### b. *Coercion by Seller.*

Defendants also argue that plaintiffs failed to establish the requisite coercion, given that plaintiffs voluntarily elected to accept the Plan as a whole upon their execution of the subscription agreements. This argument is not persuasive. While plaintiffs may have willingly subscribed to the Plan, the leases were clearly detrimental to their interests. The Court finds credible plaintiffs' testimony that they objected to the leases' inclusion throughout the course of the negotiations and does not credit defendants' testimony that the Sponsor was never asked to quote a price for the apartments independent of the leases. Plaintiffs apparently agreed to these leases because they believed their acceptance was necessary to effect the cooperative conversion. Although we will never know for certain whether plaintiffs could have separated the tying and tied products by refusing to release their "No–Buy Agreements" until the leases were eliminated, the Court finds credible plaintiffs' testimony that defendants stated that they would not sell the Building without the leases.

### c. *Seller's economic power in the tying product market.*

The fact that plaintiffs were required to purchase two products that could have been purchased separately does not make the sale of this package illegal. Neither hard bargaining nor even stone-walling and rude behavior such as that testified to here is the type of coercion prohibited by the antitrust laws. Plaintiffs must show either that the "seller's share of the market is high," *Jefferson Parish,* 466 U.S. at 17, 104 S.Ct. at 1560, or that "the seller has some advantage not shared by his competitors in the market for the tying product."

*Yentsch,* 630 F.2d at 58 (citing *U.S. Steel Corp. v. Fortner Enterprises* ["*Fortner II*"], 429 U.S. 610, 620, 97 S.Ct. 861, 867, 51 L.Ed.2d 80 [1977] ). Plaintiffs have shown neither.

Although defendant Parker had a substantial interest in the ownership of 3,000 apartments converted in New York City between 1981 and 1984, plaintiffs admit that defendants' interest in the cooperative market in New York City or even in any defined submarket (*e.g.,* a neighborhood) that would include the Building does not rise to the level of market control required to constitute sufficient economic power in the tying product market. Plaintiffs thus rely on the alternative formulation of market power, uniqueness. The role of a product's uniqueness in an assessment of market power was described in *Fortner II:*

> the unique character of the tying product has provided critical support for the finding of illegality in prior cases.... [T]hese decisions do not require that the defendant have a monopoly or even a dominant position throughout the market for a tying product. They do, however, focus attention on the question of whether the seller has the power, within the market for the tying product, to raise the prices or to require purchasers to accept burdensome terms that could not be expected in a completely competitive market. In short, the question is whether the seller has some advantage not shared by his competitors in the market for the tying product.

429 U.S. at 619–620, 97 S.Ct. at 867–868. Plaintiffs here claim that the tying product (the Building consisting of 386 individual apartments) is unique because it represents the plaintiffs' homes, individually and collectively. Plaintiffs also claim that the Building is unique because it represents a once in a lifetime opportunity to purchase an apartment for an "insider" (discounted) price.

In support of this proposition, plaintiffs rely on a line of cases holding that patent and copyright monopolies and extensive land holdings are unique products that can give rise to a presumption of economic power. *See Fortner II,* 429 U.S. at 619, 97 S.Ct. at 867. In *Northern Pacific Railway Co. v. U.S.,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), the Court held that the defendant railroad's land (the tying product) was sufficiently unique to enable it to coerce land buyers into agreeing to transport their goods on the defendant's railroad (the tied product). The Court described the land in question as

> strategically located in checkerboard fashion amid private holdings and within economic distance of transportation facilities. Not only the testimony of various witnesses but common sense makes it evident that *this particular land* was often prized by those who purchased or leased it and was *frequently essential* to their business activities.

*Id.* at 7, 78 S.Ct. at 519 (emphasis added).

Plaintiffs also rely on a series of cases that they argue stand for the proposition that a cemetery may be considered "unique" for purposes of establishing market control. *See Rosebrough Monument Co. v. Memorial Park Cemetery,* 666 F.2d 1130 (8th Cir.1981); *Baxley–DeLamar Monuments v. American Cemetery Association,* 843 F.2d 1154 (8th Cir.1988). These cases, however, do not hold that the uniqueness of the property alone is sufficient to establish market power in the tying market. In finding that the defendant cemetery owners have sufficient economic power to compel a tying arrangement on its customers, *Rosebrough* states that "[a] cemetery lot, like any piece of real estate, is unique," *id.* at 1143, but relies also on the fact that defendants accounted for 22 percent of the burials performed in the market area. *Id.* Similarly, *Baxley–DeLamar Monuments* states that the defendants' "alleged collective share of the ... cemeteries in the cemetery lot market ('a majority') is higher than that in *Rosebrough* ...." 843 F.2d at 1157. Because defendants do not control a significant share of the tying product market, these cemetery cases do not assist plaintiffs.

If plaintiffs had demonstrated that significant numbers of Tenants considered their apartments to be unique (irreplacea-

ble or dissimilar to others on the market), they might have shown that the Sponsor had certain leverage over them. But Owners Corp.'s computerized shareholder list shows that 162 of 386 Tenants either assigned their right to purchase to someone else before closing, or sold ("flipped") their apartments within three years of purchasing them at the insider price.[7] DTE OOO. Unlike plaintiff in *Northern Pacific Railway Co.,* 356 U.S. at 7, 78 S.Ct. at 519, plaintiffs here have not shown that this particular real estate possessed qualities different from other real estate, that is, other residential properties in New York City.

The Court finds that the only reason this building was unique for these plaintiffs is that it was the only building in which plaintiffs' status as tenants gave them governmentally-mandated rights that permitted them to purchase apartments at an "insider price." To construe plaintiffs' governmentally-mandated ability to command a discount as giving defendants market power over plaintiffs would turn antitrust law on its head. Even weighing some Tenants' strong desire to remain in their present homes, it was the Tenants who held the advantage not held by other buyers in the market place. The non-eviction plan proposed by the Sponsor specified that the Sponsor could sell to "outsiders" (non-residents) only if a Tenant did not want to buy *and* did not want to remain as a rent stabilized tenant. This gave the Tenants the ability to secure an offer substantially lower than the then-market price. Defendants' only market leverage over the Tenants was that they were offering them a deal too good to refuse: remain as you are[8] or purchase at a substantial discount.

d. *Anticompetitive effects in the tied market.*

Although plaintiffs' failure to establish that the Building is "unique" precludes plaintiffs from succeeding on their antitrust claim, even if Tenants had convinced the Court that the requisite uniqueness existed to give defendants leverage in the tying market, plaintiffs' claim would still fail because they have not established the fourth prong of the Second Circuit's test for an unlawful tying arrangement, the existence of "anticompetitive effects in the tied market." *Yentsch,* 630 F.2d at 57.

The relevant tied product market is the market for providing management services for residential buildings, commercial space, laundries, and garages in New York City; companies capable of providing these services consist of companies located in New York City, and perhaps companies in Northern New Jersey and Southern Connecticut. Plaintiffs made almost no attempt at trial to define the tied product market. They offered only the testimony of the current Building manager and garage operator who testified that they were precluded from bidding on the contested leases at the time of the conversion. Defendants' withdrawal of this business from the marketplace could in some situations constitute circumstantial evidence of some anticompetitive effect in the tied product market. There must be, however, an effect on an "appreciable number of buyers" in the tied product market. *Fortner Enterprises, Inc. v. United States Steel Corp.*

---

**7.** Tenants who sold their apartments within three years of the conversion were assessed a transfer fee or "flip tax" by Owners Corp. Tenant lawyer Sonnenschein testified that three to five years is the most commonly used period for such an assessment. Recognizing that there are many reasons, both anticipated and unanticipated, that lead a homeowner to sell, the Court believes it is fair to assume that those who sold within three years of the cooperative conversion did not view their apartments as unique.

**8.** The Court is not persuaded by plaintiffs' claim that remaining in the Building as a rent stabilized tenant would have been untenable. Plain-

tiffs did not substantiate their bald assertion that rent-stabilized tenants living in a cooperative building receive substandard treatment, and their claim that the future of rent stabilization is uncertain is inconsistent with their argument that the "insider price" is not a bargain price but "merely reflects the value of the existing rent stabilized lease." *Plaintiffs' Trial Memorandum of Law* at 7. Market forces would not result in rent stabilized tenants receiving a substantial discount on the purchase of their apartments if buyers and sellers viewed the right of rent stabilized tenants to remain in their apartments as so uncertain.

**1308**

(*"Fortner I"*), 394 U.S. 495, 504, 89 S.Ct. 1252, 1259, 22 L.Ed.2d 495 (1969). The Supreme Court has refused to condemn tying arrangements that do not foreclose a substantial volume of commerce:

> [i]f only a single purchaser were 'forced' with respect to the purchase of a tied item, the resultant impact on competition would not be sufficient to warrant the concern of antitrust law. It is for this reason that we have refused to condemn tying arrangements unless a *substantial volume of commerce is foreclosed* thereby.[9]

466 U.S. at 16, 104 S.Ct. at 1560 (emphasis added). Defendants' management of one garage, one set of commercial stores, one laundry, and one residential building in the vast tied product market could have but a minuscule impact in the market for these services.

In addition, the testimony of the present garage manager and building manager does not establish that defendants' activities foreclosed a substantial volume of commerce in the tied product market. Plaintiffs offered no other testimony on this point. On behalf of the defendants, Jamusz A. Ordover, an economist, testified that, from a purely economic perspective, if the major concern in an illegal tying arrangement is the diminished competition in the market for the tied product, the cooperative conversion in this case had *no* impact on competition because "the Sponsor's organizations were there before [the conversion] managing the laundry, the garage, the commercial space and the Building, and they remained there afterwards." Tr. at 815. Plaintiffs have failed to show that defendants' activities had even a *de minimis* impact on competitors in this tied product market.

*e. Involvement of the requisite amount of interstate commerce in the tied product market.*

The fifth element of the Second Circuit's test for an illegal tying arrangement requires "involvement of a 'not insubstantial' amount of interstate commerce in the tied product market." The threshold for satisfying this prong is low:

> [t]he requirement that a 'not insubstantial' amount of commerce be involved makes no reference to the scope of any particular market, or to the share of the market foreclosed by the tie.... [N]ormally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar volume so as to be merely *de minimis*, is foreclosed to competitors by the tie....

*Fortner I*, 394 U.S. at 501, 89 S.Ct. at 1257. The court in *Yentsch* noted in *dictum* that $86,376.72 of foreclosed competition is not insubstantial. 630 F.2d at 58. Plaintiffs testified here that defendants' alleged tying arrangement precluded companies operating in interstate commerce from providing services to Owners Corp. costing at least $300,000 annually for up to 40 years. The court concludes that this total dollar volume of the leases is sufficiently substantial to satisfy the fifth element of the tying inquiry.

In conclusion, because plaintiffs have failed to establish both that the tying product is unique and that the alleged tying arrangement had anticompetitive effects in the tied product market, plaintiffs' antitrust claim must fall.

*3. The Unconscionability Claim* [10]

■ The court also finds in favor of defendants on plaintiffs' state law claim that

---

**9.** Justice O'Connor's concurrence in *Jefferson Parish*, in which she was joined by three other Justices, states that in order to succeed on a tying claim, a plaintiff must show that there is "a substantial threat that the tying seller *will acquire market power* in the tied-product market." 466 U.S. at 38, 104 S.Ct. 1572 (emphasis added). While the Second Circuit has not adopted this more stringent standard (and neither does this Court), other courts have done so. *See Carl Sandburg Village Condo. Assn. v. First*

Condo, 758 F.2d 203, 210 (7th Cir.1985); *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 674 (7th Cir.1985); *Smith Machinery Co., Inc. v. Hesston Corp.*, 1987–1 Trade Cases (CCH), ¶ 67,563 at 60,383, 1987 WL 14498, (D.N.M. 1987). *But see Parts and Elec. Motors v. Sterling Electric*, 826 F.2d 712, 719 (7th Cir.1987).

**10.** The Court has pendent jurisdiction over this cause of action. *See United Mine Workers of*

the commercial lease was unconscionable. Under New York common law, there are two prongs to an unconscionability claim: "an unconscionable agreement is one marked by [1] an absence of meaningful choice on the part of one of the parties, together with [2] contract terms that are unreasonably favorable to the other party." *Leasing Service Corp. v. Broetje*, 545 F.Supp. 362, 366 (S.D.N.Y.1982) (citing *Blake v. Biscardi*, 62 A.D.2d 975, 403 N.Y. S.2d 544, 547 [1978]).

In determining whether there was meaningful choice, courts have considered, among other things, whether the defendant used "deceptive practices and language in the contract," *State v. Wolowitz*, 96 A.D.2d 47, 468 N.Y.S.2d 131, 145 (1983), whether there was an "imbalance in the understanding and acumen of the parties," *id.*, "whether each party had a reasonable opportunity to understand the terms of the contract," *Leasing Service Corp.*, 545 F.Supp. at 367, and whether the plaintiffs were represented by a lawyer of their choice. *Blake*, 403 N.Y.S.2d at 547.

In deciding whether contract terms are "unreasonably favorable" to one side, courts view

> the terms [of the contract] ... in the light of the general commercial background and the commercial needs of the particular trade or case.... [The test is] whether the terms are so extreme as to appear unconscionable according to the mores and business practices of the time and place.

*Williams v. Walker–Thomas Furniture Company*, 350 F.2d 445, 450 (D.C.Cir.1965) (citations omitted). The emphasis, however, in the unconscionability inquiry, is on the first prong—the contract-making process: "[b]y focusing on the manner in which a contract is entered into and the status of the parties, the doctrine is de-

signed to insure the freedom of contract and not to negate it." *Wolowitz*, 468 N.Y. S.2d at 145.

In this case, plaintiffs have not shown that they were at such a disadvantage during the negotiation process that they had no meaningful choice at the time they purchased their shares in the Building. The Tenants formed a well-organized Tenants Association, hired experienced counsel and consultants, negotiated over the course of several months, and voluntarily executed a subscription agreement incorporating each of the terms of the Plan, with full knowledge that the Plan contained the disadvantageous leases. By negotiating a change in the Plan from eviction to non-eviction, the Tenants had options other than purchasing, including remaining in the Building as rent-stabilized Tenants or moving to other housing in the New York Metropolitan area. Moreover, the fact that the Tenants had sufficient bargaining power to force a sale at a price substantially below market value cuts against their argument that they were victims of an unconscionable contract.

Furthermore, the Court does not find this provision to be unreasonably favorable to defendants when viewed in the context of the overall bargained for exchange.[11] When the Plan contained an eviction clause, over 80 percent of the Tenants signed No Buy Agreements that were not rescinded until that provision was removed. The Tenants similarly had the option to refuse to rescind their No Buy Agreements until the Sponsor removed the commercial lease provision. This Court can only assume that the Tenants did not do so because the overall package was sufficiently advantageous. The Court thus declines to renegotiate the sale of the Tenants' apartments by voiding a selected portion of the Plan while leaving intact those provisions the plaintiffs find advantageous.[12] Plain-

---

*America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

**11.** Even if the proper inquiry were to examine the commercial lease in isolation, the court still does not find this provision unconscionable. *See Wolowitz*, 468 N.Y.S.2d at 145 ("[w]hile there may be extreme cases where a contractual

term is so outrageous and oppressive as to warrant a finding of unconscionability irrespective of the contract formation process ... such cases are the exception").

**12.** Plaintiffs have never requested that this Court find the Plan as a whole unconscionable nor did any plaintiff tenant indicate at trial that

tiffs' unconscionability claim is therefore rejected.

CONCLUSION

For the reasons stated above, the Court finds in favor of the defendants on both the Sherman Act antitrust claim and the state law unconscionability claim.

SO ORDERED.

he or she made the wrong decision by subscrib- ing to the Plan as finally offered by defendants.