[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 24-10678

Non-Argument Calendar

————————————————

MIDAMERICA C2L INCORPORATED,
a Nevada corporation,

Plaintiff
Counter Defendant
Appellant,

SECURE ENERGY INC.,
a Nevada corporation,

Plaintiff-Appellant,

*versus*

SIEMENS ENERGY INCORPORATED,
a Delaware corporation,

Defendant

Counter Claimant

Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:17-cv-00171-PGB-LHP

_____

Before LAGOA, BRASHER, and ABUDU, Circuit Judges.

PER CURIAM:

This case returns on appeal for a third time. For nearly a decade, Secure Energy, Inc. ("Secure") contracted with Siemens Energy, Inc. ("Siemens") to procure gasification equipment and technical support for its coal plant in Illinois. Marred by falling natural gas prices and malfunctioning equipment, Secure's plant never became operational. In 2016, Secure—along with its subsidiary, MidAmerica C2L Inc.[1]—sued Siemens, bringing various fraud- and contract-based claims arising from the failed business venture. Following discovery, the district court granted Siemens summary judgment on each of Secure's claims, including four claims

_____

[1] For purposes of this opinion, we refer to MidAmerica C2L Inc. as "Secure" unless otherwise expressly noted.

premised on the theory that the equipment Secure purchased from Siemens was defective.

When this case was last on appeal, we reversed the district court's entry of summary judgment for Siemens on those four counts, finding the court's sole basis for doing so—that Secure was required to, but did not, introduce expert testimony showing a design defect—to be erroneous. *MidAmerica C2L Inc. v. Siemens Energy, Inc.* (*MidAmerica II*), 2023 WL 2733512, at *10 (11th Cir. Mar. 31, 2023). Accordingly, we remanded for the district court to consider Siemens's alternative arguments for summary judgment in the first instance.

On remand, the district court once again entered summary judgment for Siemens. This appeal follows.

## I.    BACKGROUND

### A.    Factual Background

Secure was formed in 2006[2] to develop and construct a facility in Decatur, Illinois, to convert coal into synthetic natural gas using a process called coal gasification.[3] To that end, Secure began

---

[2] Secure's subsidiary, Secure Energy Decatur, LLC, was formed shortly after this time and was the original entity contracting with Siemens.

[3] Gasification converts carbonaceous, fossil-fuel based material (e.g., coal) into gas (e.g., synthetic natural gas) by feeding pulverized coal (called feedstock) into large pieces of equipment called gasifiers. *See* Ronald W. Breault, *Gasification Processes Old and New: A Basic Review of the Major Technologies*, 3 Energies 216, 218 (2010).

shopping around for a Basic Engineering Design Package ("BEDP") and Product Design Package ("PDP") from a coal gasification technology provider, eventually contacting Siemens. Lars Scott and Jack Kenny, the two founders of Secure, met with Rolf Rüsseler and Harry Morehead of Siemens. During these meetings, Siemens represented to Secure that Secure was purchasing a proven technology from Siemens, as it started the equipment's design in the mid-1970s and it had over twenty years of experience in coal gasification. Siemens also represented that its current 500-megawatt gasifiers—which Secure was interested in—employed a technologically advanced cooling-screen system that accepted a wide range of feedstock and could achieve "up to >99%" carbon conversion rates. And Siemens had sold the 500-megawatt gasifiers to one customer in China.

Impressed with these representations, Secure used Siemens for its equipment and technology needs. On July 24, 2007, Secure and Siemens entered into a "Memorandum of Understanding" memorializing the parties' intention for Secure to buy from Siemens two 500-megawatt gasifiers, associated equipment, engineering services, and a process license.

On December 21, 2007, Secure and Siemens entered into a formal contract (the "2007 Contract") in which Secure would purchase Siemens's products and services for €27,715,000 plus $1,717,000—in total, about $40 million. The 2007 Contract, and every subsequent contract at issue, included a merger clause, which stated that neither "party will be bound by any prior obligations,

conditions, warranties or representations." Secure promptly paid to Siemens the $40 million called for in the 2007 Contract.

Secure and Siemens also entered into a licensing agreement (the "2007 LSA") in which Secure licensed Siemens's technology for about €11.7 million. Secure was to pay the €11.7 million licensing fee pursuant to an agreed upon fee schedule within the 2007 LSA.

The burners—a core component of Siemens's gasifiers—were delivered to Secure in Decatur, Illinois, in March 2009. Secure alleges that the pins in the cooling screen of the burners were too short and out of specification, although Siemens disputes this characterization. But Secure only learned of this alleged defect during the litigation—it never opened or put into operation the Siemens gasifiers after it took possession of them.

The price of natural gas plummeted in 2009; as a result, Secure abandoned its original plan of converting coal to natural gas and began planning to build a coal-to-gasoline gasification plant instead. But because the plot of land Secure had acquired in Decatur could not accommodate this change, Secure decided to move its plant to West Paducah, Kentucky.

Secure's new plans in Kentucky required no changes to the Siemens gasification equipment, so the parties continued their business relationship. On March 31, 2010, Secure and Siemens entered into a Completion Agreement (the "2010 Completion Agreement"), which terminated the parties' previous agreements in the 2007 Contract and 2007 LSA, as well as a new License Agreement (the "2010 LSA"). The 2010 Completion Agreement also stipulated

that Siemens had met its performance goals under the 2007 Contract and 2007 LSA and released both parties from *any claim* related to those contracts.  In addition, the 2010 LSA included a warranty extension on the gasifiers (which would have otherwise expired in 2011) upon Secure's payment of a €1 million fee, but Secure never paid the fee.  The 2010 LSA also set forth terms for paying the licensing fee under the agreement, requiring: (1) Secure to pay Siemens €300,000 at the "Contract Date"; (2) €700,000 within five business days of the date of "Closing of New Equity" or July 31, 2010, whichever was later; (3) €10.2 million upon "Financial Close," but no later than August 30, 2011 (unless otherwise agreed to by the parties); and (4) €1.2 million when "Acceptance" occurred, but no later than December 31, 2014.

At around the same time Siemens was working with Secure, Siemens sold five 500-megawatt burners to a client which installed the burners at its coal-to-polypropylene plant in China ("NCPP"). These burners were first used in October 2010.  Immediately, there were problems.  The burners that Siemens had used were having trouble converting the Chinese coal into synthetic gas.  The pilot burner was also "unreliable" and had to be removed twenty-five times on two of the gasifiers at NCPP in the first two months.  The cooling screens also had issues, with the flame from the burner hitting them at an awkward angle.

Siemens explains away these problems by explaining that the Chinese client used below-grade coal in the gasifiers at NCPP and loaded the incorrect fuel source into the burners.  And Siemens

admits that some of the parts of the gasifiers required repair but maintains that none of the gasifiers were defective. In any event, it is beyond dispute that, from 2010 to 2012, NCPP experienced numerous problems and the Chinese client went forward and made "optimizations and modifications" at NCPP. At one point, the Chinese client sought payment from Siemens for the issues it corrected related to NCPP, and by 2014, the Chinese client had replaced its Siemens burners with burners from a Chinese engineering firm.

Internal Siemens documents from this period identified the problems. In October 2012, Rüsseler sent an internal Siemens email in which he explained that the "message" to Secure should be to "scrap the equipment, we'll start over again." On November 13, 2012, Siemens circulated an internal memo discussing the needed improvements to the burners, which estimated that the improvements would take 8,520 engineering hours. At this point, Secure had changed its business plan again, this time planning a coal-to-methanol plant at its Kentucky location.

On July 18, 2012, Secure and Siemens entered into a new Completion Agreement ("2012 Contract") and License Agreement ("2012 LSA") (collectively, "2012 Contracts"). The 2012 LSA included a merger clause that terminated all prior agreements. Pursuant to the 2012 LSA, Secure was required to pay Siemens a €12.48 million licensing fee. The 2012 LSA recognized that Secure had paid €300,000 in 2010, meaning that Secure still owed Siemens €12.18 million under the 2012 LSA. Secure was required to pay the remaining €12.18 million as follows: (1) €10.932 million upon

"Financial Close"—defined as the moment "construction financing for the [p]roject ha[d] been arranged," i.e., once Secure had secured financing—but no later than February 28, 2013; and (2) €1.248 million when "Acceptance" occurred—defined by the parties as once specified reliability and performance tests were successfully completed and demonstrated— but no later than December 31, 2015. The 2012 LSA also provided that, in the event Secure fails to make payment when due, and after the 15-business-day cure period, Siemens would have the right to terminate the agreement and Secure would owe Siemens ninety-two percent of the licensing fee if Financial Close had not yet occurred.  The 2012 Contracts substituted MidAmerica, Secure's subsidiary, for Secure as the contracting party.

Not much later, Secure sought to obtain a construction and financing contract for its plant from a company called SK Engineering & Construction.  Siemens agreed to meet with SK and Secure to help Secure acquire that agreement.  During the meeting, Siemens communicated with SK that Siemens would be implementing the improvements it learned at NCPP so long as Secure agreed to pay for them.  Siemens estimated that it would take around 8,500 engineering hours to complete.  In December 2012, however, Siemens suggested internally that incorporating these changes would "tie up resources at a time when [Siemens] need[ed] them more urgently elsewhere" and that, when offering these changes to Secure, Siemens should make "the price and schedule for this change order . . . so unattractive that [Secure] cannot draw th[e] option."

In early 2013, Siemens was in the process of pitching to a new client—the Texas Clean Energy Project ("TCEP"). Because it used a Chinese contractor, TCEP was aware of the problems the Siemens's burners had at NCPP and asked for reassurance that there were solutions to the problems that occurred with the equipment there. Siemens responded that there were, detailing twenty-eight changes to the design—the design that Secure still had—that would be implemented before the TCEP project got underway.

Secure did not make the license fee payment that came due on February 28, 2013. At the time, the Siemens gasifiers Secure purchased had not been opened. And by now, Secure's business was crumbling, with internal documents indicating "substantial doubt about [Secure's] ability to continue as a going concern." Indeed, as of December 2012, Secure admitted that "[i]n order to continue the coal gasification project, [it must] obtain grants, debt financing or additional equity investment."

In May 2014, Secure emailed Siemens asking when Secure could expect an updated BEDP and asking about the viability of its equipment. Internally, Siemens stated that "very little to nothing can be re-used [sic] and we would have to start from scratch."

By March 2015, Secure stopped making payroll payments to its employees. In July 2015, Secure advised Siemens that there might be "new life for [its] project," as SK had introduced Secure to a group in Houston that were interested in partnering with it on the Kentucky plant. But Secure was never able to obtain the necessary financing for a coal-to-fertilizer plant at the Kentucky site

that it hoped would give it that new life.  Secure then missed the December 2015 licensing fee payment due to Siemens under the 2012 LSA.  By the end of 2015, Secure had not paid any of the licensing fees under the 2012 Contracts, except for the down payment, and it had suspended its business operations.

At the same time, the market constraints that were squeezing Secure had the same effect on Siemens.  By mid-2015, Siemens decided to exit the gasification market.  On a February 2, 2016, call between Secure and Siemens, Siemens told them of its decision. Secure interpreted the call as an anticipatory repudiation of the contract—i.e., Secure believed that Siemens was communicating it would not honor the contract.

On February 11, 2016, Secure demanded rescission of the 2007 Contract and the return of all monies paid by Secure to Siemens pursuant to that contract.  On February 17, 2016, Siemens informed Secure that Siemens would not violate any contractual obligation even though Siemens was closing its coal gasification business.

In March 2016, Siemens proposed extending the license fee payment deadline and the deadline for completing "performance tests."  Secure rejected the offer, so Siemens revoked it and demanded payment of the approximately €11.5 million termination fee owed pursuant to the 2012 LSA.

## B.    Procedural History

On July 18, 2016, Secure sued Siemens in Illinois state court. After Siemens removed the case to federal court, the case was

24-10678                 Opinion of the Court                 11

transferred to the Middle District of Florida. In its amended complaint, Secure alleged six claims against Siemens: (1) breach of contract; (2) breach of warranty of fitness; (3) fraudulent misrepresentation as to support of the project; (4) fraudulent misrepresentation for failure to disclose defects; (5) rescission for fraud; and (6) rescission for lack of consideration. Siemens filed a motion to dismiss the amended complaint, which the district court granted in part as to Count III. Siemens then answered, asserting a counterclaim for breach of contract based on the outstanding payment of the termination fee owed under the 2012 LSA.

After the close of discovery, both parties moved for summary judgment. The district court entered summary judgment for Siemens on Secure's claims for breach of implied warranty, fraudulent misrepresentation, rescission for fraud, and rescission for lack of consideration. According to the district court, because these claims "rely on the premise that the equipment Siemens provided is defective," Secure was required to introduce expert testimony establishing a design defect. Since Secure did not do so,[4] the district court concluded that Secure's "failure to offer expert evidence foreclose[d] any claim based on a design defect," meriting summary judgment for Siemens on Counts II, IV, V, and VI. After

_____

[4] Prior to summary judgment, Siemens moved to exclude testimony on the defective nature of the equipment by Secure's expert, Dr. Herbert Kosstrin, under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), arguing that he did not inspect the equipment purchased by Secure, that he utilized an unreliable methodology, and that his testimony would be unhelpful to the jury. The district court granted that motion and excluded Dr. Kosstrin's testimony.

supplemental briefing, the district court also granted Siemens summary judgment on Secure's breach of contract claim. But it denied summary judgment on Siemens's counterclaim.

The case proceeded to trial only on Siemens's counterclaim for breach of contract, premised on the 2012 LSA. At the end of trial, Secure made a motion for judgment as a matter of law—arguing that the evidence demonstrated that Siemens repudiated the 2012 LSA and that Secure did not breach the agreement. The district court denied the motion. On March 4, 2020, the district court returned its verdict for Siemens, awarding Siemens $13,200,395.50 in damages. Secure renewed its motion for judgment as a matter of law and, in the alternative, moved for a new trial. The district court denied both motions.

Secure timely appealed the district court's entry of summary judgment for Siemens, in addition to several pre-trial and trial orders.[5] As relevant here, we found that the district court erred in requiring Secure to present expert testimony in support of its claims premised on a design defect. *MidAmerica C2L Inc. v. Siemens Energy Inc.* (*MidAmerica I*), 25 F.4th 1312, 1330–31 (11th Cir. 2022), *vacated and superseded on reh'g*, *MidAmerica II*, 2023 WL 2733512. Although the district court considered no other grounds supporting summary judgment on these claims, we nonetheless affirmed

---

[5] The pre-trial and trial orders included (1) excluding Dr. Kosstrin's testimony, (2) denying Secure's request to file an amended complaint, and (3) denying Secure's motion for a new trial. None of these orders are at issue in this appeal.

summary judgment upon *sua sponte* review of their merits.    *Id.* at 1331–35.

Following *MidAmerica I*, this Court released its *en banc* decision in *United States v. Campbell*, 26 F.4th 860 (11th Cir. 2022) (en banc), which clarified the circumstances under which a court may *sua sponte* consider issues the parties fail to brief.[6] Secure then filed a petition for rehearing, arguing that none of the forfeiture exceptions recognized in *Campbell* justified our *sua sponte* application of alternative grounds for affirming summary judgment against Secure on Counts II, IV, V, and VI.

We granted Secure's petition as it related to the forfeiture issue, vacated our ruling in *MidAmerica I*, and substituted a new opinion in its place.[7] *MidAmerica II*, 2023 WL 2733512, at *1. In our revised opinion, we agreed with Secure that none of the *Campbell*

---

[6] Prior to *Campbell*, our Circuit had recognized "five situations in which we may exercise our discretion to consider a forfeited issue: (1) the issue involves a pure question of law and refusal to consider it would result in a miscarriage of justice; (2) the party lacked an opportunity to raise the issue at the district court level; (3) the interest of substantial justice is at stake; (4) the proper resolution is beyond any doubt; or (5) the issue presents significant questions of general impact or of great public concern." *Campbell*, 26 F.4th at 873 (first citing *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1332 (11th Cir. 2004); then citing *United States v. Godoy*, 821 F.2d 1498, 1504 (11th Cir. 1987)).  *Campbell* clarified that, even if one of these exceptions applies, a court may only consider the issue *sua sponte* if it "is extraordinary enough for us to exercise our discretion and excuse the forfeiture." *Id.* at 875.

[7] The revised opinion did not alter our conclusions as to the other orders on appeal in *MidAmerica I*.  *See MidAmerica II*, 2023 WL 2733512, at *7–10, *12–17.

exceptions justified the prior panel's *sua sponte* adoption of alternative arguments that Siemens did not brief.  *Id.* at *11.  We thus reversed the entry of summary judgment for Siemens on Counts II, IV, V, and VI, concluding that Siemens had "forfeited its alternative grounds for affirming the district court's grant of summary judgment" as to those claims.  *Id.* at *12.  However, because the district court did not consider Siemens's alternative arguments in its order granting summary judgment, we allowed Siemens to make these arguments again to the district court.  *Id.*

On remand, Siemens filed a renewed motion for summary judgment, raising its alternative arguments for summary judgment as to Counts II, IV, V, and VI.  The district court granted that motion and, once again, entered summary judgment in favor of Siemens on those claims.  Secure timely appealed that order.

## II.    STANDARD OF REVIEW

We review an order granting summary judgment *de novo*, applying the same legal standards as the district court.  *Amy v. Carnival Corp.*, 961 F.3d 1303, 1308 (11th Cir. 2020).  In doing so, we view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in his favor.  *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995).  "Summary judgment is appropriate if 'the evidence before the court shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *McCullough v. Antolini*, 559 F.3d 1201, 1204 (11th Cir. 2009) (quoting *Haves*, 52 F.3d at 921); Fed. R. Civ. P. 56(a).

### III.   ANALYSIS

On appeal, Secure contends that the district court erred in granting Siemens summary judgment on Secure's claims for breach of implied warranty, fraudulent misrepresentation, rescission for fraud, and rescission for lack of consideration. We consider each claim in turn.

### A. Count II: Breach of Implied Warranty

Secure first challenges the district court's entry of summary judgment for Siemens on Secure's claim for breach of the implied warranty of fitness for a particular purpose. The parties agree that this claim is governed by New York law pursuant to the choice-of-law provisions of the relevant contracts.

To establish a breach of the implied warranty of fitness for a particular purpose under New York law, a plaintiff must show that (1) the seller, at the time of contracting, had "reason to know the particular purpose for which the goods are required"; (2) the seller had reason to know that the buyer was "relying on the seller's skill or judgment to select or furnish suitable goods" for the specified purpose; and (3) the plaintiff actually relied on the seller's skill or judgment in buying the goods. *Emerald Painting, Inc. v. PPG Indus., Inc.*, 472 N.Y.S.2d 485, 487 (N.Y. App. Div. 1984) (quoting N.Y. U.C.C. § 2-315). Contracting parties may waive this implied warranty through a conspicuous, written disclaimer in the contract. *See Con Tel Credit Corp. v. Mr. Jay Appliances & TV, Inc.*, 513 N.Y.S.2d 166, 167 (N.Y. App. Div. 1987); *see also* N.Y. U.C.C. § 2-316(3)(a) ("[A]ll implied warranties are excluded by . . . language which in

common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty.").

Here, the parties' contracts included language waiving the implied warranty of fitness for a particular purpose. The 2012 LSA provides that:

> THE WARRANTIES AND GUARANTEES PRO-VIDED ARE IN LIEU OF ALL OTHER WARRAN-TIES AND GUARANTEES, WHETHER STATU-TORY, EXPRESSED OR IMPLIED, INCLUDING ALL IMPLIED WARRANTIES OF MERCHANTA-BILITY AND FITNESS FOR PURPOSE, AND ALL WARRANTIES ARISING FROM COURSE OF DEALING OR USAGE OF TRADE.

The 2007 Contract and 2010 LSA also included this disclaimer.

According to Secure, those disclaimers are unconscionable, and therefore, unenforceable. The district court rejected this argument, both because Secure failed to plead unconscionability in its first amended complaint and, in the alternative, because Secure did not substantiate this theory with record evidence at summary judgment. The district court did not commit reversible error in doing so.

We need not determine whether New York law required Secure to affirmatively plead unconscionability in the operative complaint, since no reasonable juror—viewing the record evidence in the light most favorable to Secure—could conclude that the waiver clause was unconscionable. "A determination of unconscionability generally requires a showing that the contract was both

procedurally and substantively unconscionable when made." *Simar Holding Corp. v. GSC*, 928 N.Y.S.2d 592, 595 (N.Y. App. Div. 2011) (quotation omitted). The procedural element "concerns the contract formation process and the alleged lack of meaningful choice; the substantive element looks to the content of the contract." *State v. Wolowitz*, 468 N.Y.S.2d 131, 145 (N.Y. App. Div. 1983) (citing *Industralease Automated & Sci. Equip. Corp. v. R.M.E. Enters., Inc.*, 396 N.Y.S.2d 427, 431 n.4 (N.Y. App. Div. 1977)). In evaluating procedural unconscionability, courts consider factors such as "inequality of bargaining power, the use of deceptive or high-pressure sales techniques, and confusing or hidden language in the written agreement." *People ex rel. Abrams v. Two Wheel Corp.*, 525 N.E.2d 692, 695 (N.Y. 1988) (citations omitted).

Secure offers three reasons for why a reasonable jury could find that the contracting process surrounding the 2012 LSA was procedurally unconscionable. None is persuasive.

To begin, Secure asserts that it "was forced to sign the 2012 contracts to use its equipment." But none of Secure's cited evidence supports that conclusion. First, Secure generally references an affidavit by Keith Clauss, an engineer whose firm, SK Engineering, "worked with Secure . . . to provide . . . a guaranteed maximum price contract for the engineering, procurement, and construction [ ] of Secure's process plant." As the district court correctly observed, "Clauss was not a party to the contract," and his affidavit provides no insight into how Siemens purportedly forced Secure to sign the agreement. Second, Secure references a single

transcript page from the deposition of Lars Scott, Secure's co-founder. It is not apparent from that excerpted portion of the deposition—which appears to cover "unanswered questions" SK Engineering had for Siemens—how this evidence indicates procedural unconscionability. Secure does not explain why this evidence is relevant either. Third, Secure directs us to several allegations in the first amended complaint. However, pleadings are not evidence, and thus cannot be used "as evidence to defeat summary judgment." *Wright v. Farouk Sys., Inc.*, 701 F.3d 907, 911 n.8 (11th Cir. 2012). Finally, Secure relies on an affidavit from Scott, cited in its entirety. Although the affidavit recounts the business relationship between Secure and Siemens, nothing therein suggests that Secure was "forced" to sign any contracts.

Unable to show direct coercion, Secure pivots to arguing that it "did not have the option of choosing a new gasification provider" before signing the 2012 LSA because the Siemens equipment was "already paid for and delivered." But no evidence suggests that Secure was left without an opportunity to negotiate the terms of the waiver provision included in the 2012 LSA or that it was less than "fully informed" of the contractual terms upon entering the agreement. *Emigrant Mortg. Co. v. Fitzpatrick*, 945 N.Y.S.2d 697, 700 (N.Y. App. Div. 2012). In fact, the undisputed evidence shows that Secure successfully negotiated extensions of payment and performance deadlines both before and after the 2012 LSA took effect.[8]

---

[8] Secure faults the district court for improperly "weighing" this evidence at summary judgment. But the district court did no such thing. Although a

24-10678                Opinion of the Court                    19

In any event, the "mere exercise of superior bargaining power . . . is not a sufficient basis for a finding of unconscionability," and none of the other factors suggesting procedural unconscionability are present here. *Burnell v. Morning Star Homes, Inc.*, 494 N.Y.S.2d 488, 490 (N.Y. App. Div. 1985) (citation omitted); *see also Brower v. Gateway 2000, Inc.*, 676 N.Y.S.2d 569, 573 (N.Y. App. Div. 1998) ("[T]he purpose of this doctrine is not to redress the inequality between the parties but simply to ensure that the more powerful party cannot 'surprise' the other party with some overly oppressive term." (quoting *State v. Avco Fin. Serv.*, 406 N.E.2d 1075, 1078 (N.Y. 1980))). We thus decline to find that the procedure surrounding the 2012 LSA was "so grossly unreasonable in light of the mores and business practices of the time and place" as to render the waiver provision unenforceable. *Nalezenec v. Blue Cross of W. N.Y.*, 569 N.Y.S.2d 264, 265 (N.Y. App. Div. 1991) (first citing 1 A.L. Corbin, *Corbin on Contracts* § 128, at 551; then citing *Mandel v. Liebman*, 100 N.E.2d 149, 152–53 (N.Y. 1951)).

---

court must view the evidence in the light most favorable to the non-movant and resolve all factual disputes in the non-movant's favor at summary judgment, *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1532 (11th Cir. 1992), Rule 56 does not require the court to ignore undisputed evidence simply because it is unfavorable to the non-movant, *see Kidd. v. Mando Am. Corp.*, 731 F.3d 1196, 1205 n.14 (11th Cir. 2013); *see also* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is *no genuine dispute as to any material fact* and the movant is entitled to judgment as a matter of law." (emphasis added)).

Lastly, Secure urges us to find the waiver provision unconscionable because "Siemens fraudulently induced Secure into signing the contract."  Even if that were true, the contract's "conspicuous and specific provisions disclaiming any representation as to [fitness], the very thing about which [Secure] alleges a misrepresentation, render it especially difficult to find procedural unconscionability under New York law." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 787 (2d Cir. 2003).  And Scott's conclusory testimony that he believed Secure was defrauded by Siemens—the only evidence Secure cites to support this point—does not meet that burden at summary judgment.  *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991) ("A nonmoving party, opposing a motion for summary judgment supported by affidavits cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial. The evidence presented cannot consist of conclusory allegations or legal conclusions." (first citing *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986); then citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968))).

Moreover, we can hardly say that the substance of the waiver provision is unconscionable, as New York's Uniform Commercial Code expressly contemplates that a seller may "exclude all implied warranties of fitness" in the written contract.  N.Y. U.C.C. § 2-316; *see also Word Mgmt. Corp. v. AT&T Info. Sys., Inc.*, 525 N.Y.S.2d 433, 435 (N.Y. App. Div. 1988) ("Since the written contract in this case clearly and conspicuously disclaims both implied warranties, such disclaimer should be given effect.").  Nor do the particular

circumstances of this transaction, including the waiver's "commercial context, [its] purpose, and [its] effect," suggest, "by any reasonable standard, those terms were . . . so overbalanced in favor of [Siemens] as to be found substantively unconscionable." *Gillman v. Chase Manhattan Bank, N.A.*, 534 N.E.2d 824, 829 (N.Y. 1988). On the contrary, Secure agreed to the waiver provision in no fewer than three contracts it had with Siemens, and has failed to demonstrate "that consent was [not] freely and knowingly given" when it did so. *Avco*, 406 N.E.2d at 1078 (citation omitted).

Since Secure cannot show that the waiver provision is unconscionable, we must apply that clause "according to the plain meaning of its terms," including its exclusion of any implied warranties. *Potter v. Grange*, 19 N.Y.S.3d 384, 385–86 (N.Y. App. Div. 2015) (quotation omitted). And because Secure "cannot claim nor be given the benefit of a warranty which it expressly waived," its implied-warranty claim fails as a matter of law. *Broderick Haulage, Inc. v. Mack-Int'l Motor Truck Corp.*, 153 N.Y.S.2d 127, 128 (N.Y. App. Div. 1956). Thus, we conclude that the district court did not err in granting Siemens summary judgment on Count II.

## B.  Counts IV & V: Fraudulent Misrepresentation & Rescission for Fraud

Next, Secure challenges the district court's entry of summary judgment for Siemens on Secure's claims for fraudulent misrepresentation and rescission based on fraud. Both fraud claims are based on Secure's allegation that it entered the 2012 LSA in detrimental reliance on Siemens's "misrepresentation[s] by omission"

22                 Opinion of the Court                 24-10678

regarding material defects in the equipment.  According to the district court, because Siemens's duty to disclose this information arose from the parties' contracts, the independent tort doctrine barred these claims.  We agree.

Florida's independent tort doctrine provides that "a plaintiff may not recover in tort for a contract dispute unless the tort is independent of any breach of contract." *Un2jc Air 1, LLC v. Whittington*, 324 So. 3d 1, 3 (Fla. 4th DCA 2021) (citation omitted).[9]  A "well established" exception to this rule is that the independent tort doctrine "does not bar tort actions based on fraudulent inducement." *Allen v. Stephan Co.*, 784 So. 2d 456, 457 (Fla. 4th DCA 2000) (first citing *Moransais v. Heathman*, 744 So. 2d 973 (Fla.1999); then citing *PK Ventures, Inc. v. Raymond James & Assocs., Inc.*, 690 So. 2d 1296 (Fla. 1997)).  That is, "[i]f the fraud occurs in connection with misrepresentations, statements or omissions which cause the complaining party to enter into a transaction, then such fraud is fraud in the inducement and survives as an independent tort." *Id.*  "However, where the fraud complained of relates to the performance of the contract, the economic loss doctrine will limit the parties to their contractual remedies." *Id.* (citing *Greenfield v. Manor Care, Inc.*, 705 So. 2d 926 (Fla. 4th DCA 1997), *rev. denied*, 717 So. 2d 534 (Fla. 1998)).

Here, Secure's fraud claims cannot be based on any fraudulent misrepresentation or omission that pre-dated the parties'

---

[9] The parties agree that Florida law applies to Secure's non-contract claims.

contractual relationship. That is because the 2010 Completion Agreement released both parties of any claims that predated its signing on March 31, 2010, and—contrary to Secure's protestations—such a waiver is enforceable. *See Billington v. Ginn-La Pine Island, Ltd.*, 192 So. 3d 77, 84 (Fla. 5th DCA 2016) (holding that "an express waiver of the right to base a claim on pre-contract representations renders the contract 'incontestable . . . on account of fraud'" (quoting *Oceanic Villas, Inc. v. Godson*, 4 So. 2d 689, 690 (Fla. 1941))). Accordingly, the scope of Secure's fraud claims is limited to representations or omission Siemens made between the signing of the 2010 Completion Agreement and the 2012 LSA.

During that period, Siemens's duty to share information with, and deliver conforming products to, Secure arose from the 2007 Contract and 2010 LSA. For example, both agreements required that, "[i]n the event of any defect in any workmanship or materials *discovered* during the warranty period . . . Siemens shall, at its option either reperform, repair or replace the defective Work." To the extent Siemens withheld information about known defects or provided faulty equipment, then, the proscriptions against doing so were "derived from the contract." *J Square Enters. v. Regner*, 734 So. 2d 565, 567 (Fla. 5th DCA 1999) (quoting *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So.2d 1238, 1239 (Fla. 1996)). Because such "[m]isrepresentations relating to the breaching party's performance of a contract do not give rise to an independent cause of action in tort," *Hotels of Key Largo, Inc. v. RHI Hotel, Inc.*, 694 So. 2d 74, 78 (Fla. 3d DCA 1997), Secure cannot repackage its contract claims under a theory of fraud. Thus, the district court

did not err in granting Siemens summary judgment on these counts either.

### C. Count VI: Recission for Lack of Consideration

Finally, Secure maintains that the district court erred in applying Florida law, instead of New York law, in evaluating its claim for rescission based on a lack of consideration. Although the parties hotly dispute which state's law governs this claim, we need not resolve that issue here, since the district court found that this claim was time-barred under both Florida and New York law. Secure did not challenge that basis for summary judgment in its opening brief and thus abandoned its opportunity to do so. *LaCourse v. PAE Worldwide Inc.*, 980 F.3d 1350, 1360 (11th Cir. 2020); *see also United States v. Levy*, 379 F.3d 1241, 1244 (11th Cir. 2004) ("[T]his Court . . . repeatedly has refused to consider issues raised for the first time in an appellant's reply brief." (collecting cases)). Under such circumstances, "it follows that the judgment is due to be affirmed." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 679 (11th Cir. 2014). Therefore, we will not disturb the district court's entry of summary judgment for Siemens on Count VI.

### IV.    CONCLUSION

For the reasons stated, we affirm the district court's order entering summary judgment for Siemens on Counts II, IV, V, and VI.

**AFFIRMED.**